1  Michael S. Kogan (SBN 128500)
   **KOGAN LAW FIRM, APC**
2  11500 W. Olympic Blvd., Suite 400
   Los Angeles, California 90064
3  Telephone (310) 954-1690
   mkogan@koganlawfirm.com
4

5  Attorneys for Debtor

6            **UNITED STATES BANKRUPTCY COURT**

7              **CENTRAL DISTRICT OF CALIFORNIA**

8                   **LOS ANGELES DIVISION**

9  In re                                )  **Case No. 2:22-bk-12633-ER**
                                        )
10 **INDIE BREWING, LLC,**              )  **Chapter 11**
                                        )
11         Debtor.                      )  **MOTION OF DEBTOR FOR SALE OF**
                                        )  **PROPERTY FREE AND CLEAR OF LIENS**
12                                      )  **AND ASSUMPTION AND ASSIGNMENT**
                                        )  **OF EXECUTORY CONTRACTS OF THE**
13                                      )  **DEBTORS BUSINESS ASSETS –**
                                        )  **TORTUGO BREWING COMPANY, LLC;**
14                                      )  **MEMORANDUM OF POINTS AND**
                                        )  **AUTHORITIES AND DECLARATION OF**
15                                      )  **KEVIN O'MALLEY IN SUPPORT**
                                        )  **THEREOF**
16                                      )
                                        )
17                                      )  **Date:     June 22, 2022**
                                        )  **Time:     10:00 a.m.**
18                                      )  **Place:    Courtroom 1568**
                                        )
19 _____

20        Indie Brewing, LLC, the debtor and debtor-in-possession herein (the "**Debtor**" or "**Seller**")

21 in this bankruptcy case, hereby submits this Motion Of Debtor For Sale Of Property Free And

22 Clear Of Liens And Assumption And Assignment Of Executory Contracts of the Debtors Business

23 Assets – Tortugo Brewing Company, LLC (the "**Motion**").

24        Pursuant to the Motion, the Debtor seeks an order, pursuant to Sections 363 and 365 of

25 Title 11 of the Bankruptcy Code (the "**Bankruptcy Code**"), approving the sale of certain of the

26 Business assets (the "**Acquired Assets**"), and assumption and assignment of certain designated

27 executory contracts free and clear of all liens, claims and interests to Tortugo Brewing Company,

28 LLC (the "**Buyer**"), or its assignee pursuant to the Asset Purchase Agreement (the "**Agreement**"

1  or "**APA**")[1] entered into between the Buyer and the Debtor. The Buyer owns a business similar to

2  the Debtor's, which is well known both to the Debtor and other interested parties.  The Debtor

3  operated a craft brewery and tasting room (the "**Business**") in the Boyle Heights section of Los

4  Angeles from 2015 through 2022.  It was the first craft brewery on the eastside of LA since the

5  70s.  Since opening, the Business has grown and attracted a devoted following of local customers

6  as well as people looking for a comfortable space to unwind near downtown Los Angeles.  It had

7  over 200 accounts throughout Los Angeles and was served at Dodger Stadium in 2021. The

8  effects of the COVID Pandemic, coupled with the realization that there was nothing else to offer

9  its landlord to obtain its consent resulted in the Debtor having no alternative but to file this case.

10  The Debtor has determined that a liquidation sale of its assets will likely result in the greatest

11  distribution to its creditors on their claims against the estate. The Buyer's business is performing

12  well financially, and the Debtor is satisfied that the Buyer has the financial capacity to complete

13  the sale and capital to operate and perform on the obligations on the Acquired Assets, and assume

14  the executory contract for the Acquired Assets. The Debtor has received financial information

15  concerning the Buyers credit worthiness. The sale will be noticed to all previous interested parties

16  to the Acquired Assets, and to creditors and other interested parties.  The Debtor believes that all

17  burdens of establishing a sound business justification for the sale of the Acquired Assets have

18  been met.  The Debtor believes that the purchase price (the "**Consideration**") maximizes the value

19  of the Acquired Assets to the estate.  The terms of the sale with the Buyer have been negotiated at

20  arms-length and the consideration for purchase of the Acquired Assets is fair and reasonable, and

21  represents the fair market value for the Acquired Assets.  Therefore, the Motion should be

22  approved. If there are over bidders for the purchase of the assets, the Debtor requests that the

23  procedures outlined herein are approved.

24        The Debtor believes that all burdens of establishing a sound business justification for the

25  sale of the Acquired Assets have been met:

26        1.       The Debtor believes that the purchase price (the "**Consideration**") maximizes the

27

28

[1] Unless otherwise stated, defined terms are as set forth in the APA.

2

1    value of the Acquired Assets to the estate.

2    2.    The terms of the sale with the Buyer have been negotiated at arms-length and the

3    consideration for purchase of the Acquired Assets is fair and reasonable, and

4    represents the fair market value for the Acquired Assets.

5    3.    Additionally, the Debtor has satisfied all procedural requisites of notice of the

6    Motion to obtain Court approval of this sale.

7    4.    The terms of the proposed sale are embodied in the Agreement, which is attached

8    as Exhibit "A" hereto and incorporated herein by this reference.

9    The Consideration is the best offer that the Debtor has received and expects to receive for

10    the Acquired Assets. **The Consideration is valued at $7,200 to the Debtor and the assumption**

11    **of** the obligations of U.S. Bank Equipment Finance estimated to be approximately $89,176.56 plus

12    accrued interest. Furthermore, to maximize the greatest value for this estate and its creditors,

13    parties offering to purchase the Acquired Assets, shall have the opportunity to overbid

14    ("**Overbid**") for the purchase of the Acquired Assets **at the time of the hearing on the Motion,**

15    on substantially the same or better terms as set forth in the Agreement. Any initial overbid for the

16    Acquired Assets shall be in an amount not less than ten thousand dollars ($10,000) which is

17    greater than the Buyers offer and curing and assuming the executory contract with U.S. Bank

18    Equipment Finance , or such amount that the Court sets, and the procedures for Over bidders are

19    set forth more fully in the Motion. Any and all additional Overbids will be subject to any further

20    Overbid amount requirements, set by the Court.

21    Any other parties interested in bidding on the Assets ("**Interested Bidders**") must submit

22    to counsel of the Seller, by no later than five (5) business days before the hearing set to approve

23    the Sale, cash or a money order or a cashier's check made payable to "Kogan Law Firm, APC

24    Client Trust Account" in the amount of ten thousand dollars ($10,000), which amount shall be

25    paid by any successful Overbidder as a nonrefundable deposit and held by Sellers in a trust

26    account pending closing of the sale transaction; and at the time of the Sale, any Overbidder must

27    demonstrate the ability to pay the remaining portion of the purchase price ("**Remainder**

28    **Amount**") and to successfully consummate the sale transaction. Buyer shall have the right to

1    participate in any Overbid proceeding. A complete analysis of the overbid procedures is contained

2    in the attached Memorandum of Points and Authorities.

3    **THE FULL TERMS AND CONDITIONS OF THE SALE ARE INCLUDED IN THE**

4    **APA ATTACHED HERETO AS EXHIBIT "A", AND SHOULD BE CONSULTED BY**

5    **INTERESTED PARTIES**

6         **WHEREFORE**, based on this Motion, the annexed Memorandum of Points and

7    Authorities, the Declaration of Kevin O'Malley attached hereto, the arguments and statements of

8    counsel to be made at the hearing on the Motion, and other admissible evidence properly brought

9    before the Court, the Debtor respectfully requests that the Court authorize the sale of the Acquired

10   Assets and assumption and assignment of executory contracts pursuant to the terms of the

11   Agreement and granting to the Debtors such other relief necessary and appropriate.

12   DATED: May 29, 2022                    **KOGAN LAW FIRM, APC**

13

14

15                                    By:   /s/ Michael S. Kogan
                                          Michael S. Kogan
16                                        Attorneys for Debtor

17

18

19

20

21

22

23

24

25

26

27

28
                                              4

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Indie Brewing, LLC, the debtor and debtor-in-possession herein (the "**Debtor**" or "**Seller**") in this bankruptcy case, submits its Motion Of Debtor For Sale Of Property Free And Clear Of Liens And Assumption And Assignment Of Executory Contracts of the Debtors Business Assets – Tortugo Brewing Company, LLC (the "**Motion**"). The Debtor operated a craft brewery and tasting room (the "**Business**") in the Boyle Heights section of Los Angeles from 2015 through 2022. It was the first craft brewery on the eastside of LA since the 70s. Since opening, the Business has grown and attracted a devoted following of local customers as well as people looking for a comfortable space to unwind near downtown Los Angeles. It had over 200 accounts throughout Los Angeles and was served at Dodger Stadium in 2021. The effects of the COVID Pandemic, coupled with the realization that there was nothing else to offer its landlord to obtain its consent resulted in the Debtor having no alternative but to file this case. The Debtor has determined that a liquidation sale of its assets will likely result in the greatest distribution to its creditors on their claims against the estate. Pursuant to the Motion, the Debtor seeks an order, pursuant to Sections 363 and 365 of Title 11 of the Bankruptcy Code (the "**Bankruptcy Code**"), approving the sale of certain of the Business assets (the "**Acquired Assets**"), and assumption and assignment of certain designated executory contracts free and clear of all liens, claims and interests to Tortugo Brewing Company, LLC (the "**Buyer**"), or its assignee pursuant to the Asset Purchase Agreement (the "**Agreement**" or "APA")[2] entered into between the Buyer and the Debtor. The Buyer owns a business similar to the Debtor's, which is well known both to the Debtor and other interested parties. The Buyer's business is performing well financially, and the Debtor is satisfied that the Buyer has the financial capacity to complete the sale and capital to operate and perform on the obligations on the Acquired Assets, and assume the executory contract for the Acquired Assets. The Debtor has received financial information concerning the Buyers credit worthiness.

---

[2] Unless otherwise stated, defined terms are as set forth in the APA.

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS –
TORTUGO BREWING COMPANY, LLC**

The sale will be noticed to all previous interested parties to the Acquired Assets, and to creditors and other interested parties. The Debtor believes that all burdens of establishing a sound business justification for the sale of the Acquired Assets have been met. The Debtor believes that the purchase price (the "**Consideration**") maximizes the value of the Acquired Assets to the estate. The terms of the sale with the Buyer have been negotiated at arms-length and the consideration for purchase of the Acquired Assets is fair and reasonable, and represents the fair market value for the Acquired Assets. Therefore, the Motion should be approved. If there are over bidders for the purchase of the assets, the Debtor requests that the procedures outlined herein are approved.

## II.

## FACTUAL BACKGROUND

**A.** **Background of the Debtor.**

On or about May 9, 2022, the Debtor commenced this case by filing a Voluntary Petition under Chapter 11, Title 11, United States Code (the "**Petition Date**"). The Debtor is operating its business and managing its financial affairs as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor operated a craft brewery and tasting room (the "**Business**") in the Boyle Heights section of Los Angeles from 2015 through 2022. It was the first craft brewery on the eastside of LA since the 70s. Since opening, the Business has grown and attracted a devoted following of local customers as well as people looking for a comfortable space to unwind near downtown Los Angeles. It had over 200 accounts throughout Los Angeles and was served at Dodger Stadium in 2021. The Debtor encouraged many local food vendors and merchants to do their first "pop up" at the Business and as a result, several small businesses launched from the welcoming atmosphere created by the Debtor.

The Debtor has been profitable in the past, and is very well regarded, however, a number of events impacted its ability to continue profitable operations. **First**, due to the COVID Pandemic its Business was severely impacted. In March 2020, all of the City of Los Angeles went dark. The COVID Pandemic, unprecedented in scope and destruction, spawned a massive and severe

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS – TORTUGO BREWING COMPANY, LLC**

government response that completely shuttered the Debtors operations and in fact prohibited similar operations in the City of Los Angeles.  From March 2020 through June 2020 the Debtor's tasting room (which accounted for 65% of its revenue in 2019) was shut down other than selling beer to go.  In June 2020, it appeared that the City of Los Angeles would once again be opened up for activities such as the brewery operation, unfortunately, the COVID-19 Pandemic shortly took a turn for worse, and on July 1, 2020, the State of California and then the City of Los Angeles, issued temporary closure of indoor restaurant and brewery operations, including the Debtor. From March 2020 through March 2021 the Debtor's tasting room was only open for a handful of weeks (with strict regulation) and once permitted to open in March 2021, the Debtor was only able to operate outdoors and at 50% of capacity.  Thus, from March 2020 through the February 2022 (the "**Pandemic Period**") the Debtor was either closed or required to operate at only 50% capacity.  Against this backdrop, the Debtor struggled to survive.

**Second**, prior to and throughout the COVID Pandemic and presently the Debtor has had a number of disputes with its landlord, 2301 East 7th Street, LLC (the "**Landlord**"). On or about June 30, 2014, Landlord and the Debtor entered into a written lease for the premises located at 2301 East 7th Street, #100C (the "**Lease**") in which the Business operated.  On or about January 8, 2020, the Landlord and the Debtor entered into an amendment to the Lease (the "**First Lease Amendment**"), which increased the term of the Lease for five years, commencing February 19, 2020 and ending February 18, 2025 (the "**Term**").  The First Lease Amendment provided for monthly base rent in the amount of the $13,800 plus a proportionate amount for various property expenses (the "**Rent**").

During March 2020, Los Angeles County issued an Executive Order that imposed a temporary moratorium on evictions for non-payment of rent by residential or commercial tenants impacted by the COVID Pandemic (the "**Moratorium**").  The Moratorium has been extended through December 2022. Pursuant to the Moratorium which the Debtor took advantage of, commercial tenants, such as the Debtor with less than 9 employees have until January 31, 2023 to repay any past due rent that accrued from March 2020 to January 2022.  Notwithstanding the

7

Moratorium and the relief from Rent it provided, the Debtor, in good faith, paid Rent to Landlord during the Pandemic Period in an amount equal to approximately $168,000 (or one year's Rent).

In September 2020, given the impact of the COVID Pandemic on its operations, and the horrid business conditions that persisted, the Debtor began actively marketing its Business and related assets in hopes of entering into a sale to allow it to extricate itself from its mounting liabilities and to satisfy its creditors.

By October 2020, the Debtor entered into negotiations with Alan Newman of Alchemy & Science in Burlington, Vermont, as a prospective buyer for the Business (the "**First Buyer**"). The First Buyer and Debtor delivered a letter of intent to the Landlord however the sale to the First Buyer never occurred due to resistance of the Landlord to entertain any modifications to the Lease despite the realities of the COVID Pandemic and its impact on the Debtor's Business. From November 2020 through January 2021, the Debtor contacted the Landlord on multiple occasions to discuss additional potential buyers and sales. These contacts were either not responded to, or the Debtor was otherwise instructed that the Landlord refused to consent to any sale or modifications to the Lease.

In March 2021, the Landlord, in violation of the Moratorium, sued the Debtor and its members for failure to pay rent during the Pandemic. The lawsuit resulted in even further economic duress of the Debtor and its members at a time when it was losing a significant amount of money and barely operating.

On December 2, 2021, the Debtor, after a for sale process that produced three term sheets from three different potential buyers, signed a term sheet with a successful and existing brewery, Los Angeles Ale Works, LLC (the "**Second Buyer**"). The Second Buyer operated a brewery and tasting room in Hawthorne for six years, was in the process of opening another location in Culver City which has now opened, and was interested in the Business because it provided a turn-key opportunity for expansion in the downtown area. The Debtor and the Second Buyer entered into a term sheet pursuant to which the Second Buyer would acquire the Business (the "**Sale**"). The proceeds of the Sale would have paid the Landlord in full as well as all the Debtors creditors

8

(including the Small Business Administration, the IRS and other governmental entities) while the members and equity holders of the Debtor were not to receive any proceeds. The Sale was being conducted completely for the benefit of the creditors and the Landlord was receiving almost 50% of the Sale proceeds.

On December 2, 2021, the Debtor provided a copy of the executed term sheet to the Landlord. It requested a copy of the Lease cure amount and an assignment. From approximately December 2 to December 13, 2021, the Debtor continued to inform the Landlord that it was losing cash, and that it needed to know the Landlord's position, as it did not want to lose the Second Buyer.

On December 13, 2021, the Landlord informed the Debtor that it would not consider a Lease assignment or modification until the Lease defaults were cured. The next day, the Debtor again informed the Landlord that it did not have sufficient cash to cure the default and the only way that it could cure the Lease defaults was through the Sale. The Debtor explained that it had found an excellent and well-qualified buyer for the Business, any Lease defaults would be cured in full upon closing of the Sale via an escrow payment, and that all the Landlord needed was to consent to an assignment which would cure every default and provide the Landlord with full payment. Absent this, the Debtor explained that it would have no choice but to seek bankruptcy protection.

On February 28, 2022, due to the devastating effects of the COVID Pandemic, the Debtor ceased operating the Business to the public, except for a very small and limited distribution of beer cans sold through online media.

On March 29, 2022, the Debtor informed the Landlord that the Sale between the Second Buyer and the Debtor was in the final stages of lender approval, and that it expected to close on approximately April 15, 2022, at which point the amount necessary to cure all Lease defaults and pay the Landlord's legal fees would be placed into escrow and the assignment would be sent to the Landlord.

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS – TORTUGO BREWING COMPANY, LLC**

On April 14, 2022, the Debtor provided the Landlord with an executed purchase agreement (the "**APA**") with the Second Buyer for the Sale, along with a draft assignment that provided for: (a) repayment in full of all amounts owing to the Landlord (including all of its legal fees for its lawsuit against the Debtor and its managing members), (b) resolution and release of all outstanding claims, (c) a new tenant for the remainder of the term of the lease, and (d) all existing personal guarantees to remain in place. The Debtor explained that the Sale was expected to close on April 25, 2022, and that the Second Buyer was an established brewery that operated for several years in Los Angeles, and that the COVID Pandemic had forced the Debtor to close. The Debtor further stated that if the Sale did not close, it would have no choice but to file for bankruptcy. The Landlord then thwarted the Sale by refusing to consent to an assignment that would have provided it with full repayment and a new tenant. On April 28, 2022, the Second Buyer informed the Debtor that it was no longer interested in buying the Business and terminated the APA and the Sale because it could not comprehend why the Landlord would reject an assignment that paid it in full and gave it a new tenant for the remainder of the Lease with no effort, cost or assistance from the Landlord.

**B.**   **The Bankruptcy Case and Efforts to Sell the Business.**

The effects of the COVID Pandemic, coupled with the realization that there was nothing else to offer the Landlord to obtain its consent resulted in the Debtor having no alternative but to file this case.  Without the Sale proceeds, the Debtor has no ability to pay its creditors other than a liquidation sale which would result in likely less than the proceeds of the Sale. As a result, the Debtor commenced its Chapter 11 bankruptcy case. The Debtor believes that through liquidation of its assets and its claims against the Landlord, it will be able to make a significant distribution to its creditors on their claims.

As set forth above, the Debtor has been attempting to sell its assets for a number of years. In fact, the Debtor had a number of purchase agreements to purchase all of its assets, however in each instance the sales required the assignment of the lease which was withheld by the Landlord. Consequently, the Debtor does not believe it can sell all of its assets to a purchaser who would

1  operate in its present location. Therefore, the Debtor has marketed individual or groups of its

2  assets to many potential purchasers to obtain the best and highest value for those assets.

3      The Debtor's principals have been in the brewery business in Los Angeles for a significant

4  period and are very familiar with virtually every player in the field. Consequently, the principals

5  reached out through the industry, and contacted the LA Brewers Guild ("**Brewers Guild**") email

6  list with over 88 local breweries included and has daily emails and threads relevant to the local

7  guild members) with the attached equipment spreadsheet (which includes the equipment included

8  in the sales agreement). Have informed the Brewers Guild the Debtor will be having an open

9  house Wednesday May 25th from 10-3pm where breweries can come view the equipment and

10  make a bid (including equipment subject to the agreement). Further the Debtor has received

11  sixteen (16) emails of interest so far with the majority saying they will attend the open house on

12  May 25th to view the Acquired Assets. The principals also generally have made it known

13  throughout the industry that they would be agreeable to a sale, and believe they have reached any

14  and all potential purchasers regarding the sale of the Acquired Assets.

15      **The Debtor has determined that the best way to maximize value for its creditors and**

16  **the estate is to sell the Acquired Assets to Buyer**. The Debtor conducted an extensive marketing

17  effort for the Acquired Assets. Therefore, the Seller desires to sell, and Buyer desires to purchase,

18  subject to the terms and conditions hereof and in accordance with Sections 363 and 365 of the

19  Bankruptcy Code, the Acquired Assets as described in the APA.

20      The proposed Sale of the Assets pursuant to the procedures on the timeline proposed

21  herein represents the best opportunity to maximize the value of the Debtor's estate for all

22  interested parties. **The Debtor's ability to consummate the proposed Sale as soon as possible**

23  **is essential to maximizing the value of the estate going forward. The Sale gives creditors of**

24  **the estate the certainty of payment in a very short time.**

25      **The full terms of the Sale are set forth in the Agreement attached hereto and**

26  **incorporated herein by this reference as Exhibit "A". A summary of the relevant terms are**

27

28

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS –
TORTUGO BREWING COMPANY, LLC**

as follows[3]:

C.    **Terms of the Sale.**

The terms of the Sale can be summarized as follows:

Purchase of Assets.    Upon satisfaction of the Effective Conditions, subject to the terms and conditions of this Agreement, Seller hereby sells, assigns, transfers, conveys and delivers to Buyer (and Buyer hereby purchases), free and clear of any liens and security interests (other than liens securing the Equipment Loan (as defined below) all of Seller's right, title and interest in, to and under all of the equity listed on Schedule I attached hereto (collectively, the "*Acquired Assets*").

Purchase Price.    In consideration for the sale and transfer of the Acquired Assets, Buyer hereby agrees (a) to pay to Seller, $7,200 in immediately available funds (the "*Purchase Price*"), and (b) assume all obligations owing by Seller in connection with the Equipment Loan (as defined below).

Liabilities.    Buyer hereby assumes all debts, liabilities, obligations and responsibilities owing pursuant to Contract No. 550-0063813-000 entered into by Seller and U.S. Bank Equipment Finance (the "*Equipment Loan*") and agrees to make all payments with respect to such contract after the Effective Date. Seller hereby represents and warrants that the amount of outstanding liabilities and obligations owing pursuant to the Equipment Loan as of the date hereof is approximately $89,176.56 plus accrued interest.

Indemnification.    Buyer and Joe Kovach ("**Kovach**")[4] hereby acknowledge that each Member has personally guaranteed the obligations owing by Seller under the Equipment Loan. To facilitate the transactions set forth herein, each Member has agreed to remain as a personal guarantor on the Equipment Loan subsequent to the Closing Date. In consideration for the Members' agreement to remain personally liable on the Equipment Loan, Buyer and Kovach hereby indemnify, defend and hold harmless each Member for and from and against any and all claims, demands, liabilities, obligations, losses, damages, penalties, fines, actions, judgments, suits, costs, charges, expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel which may be imposed on, incurred by, or asserted against any Member arising out of or in any way relating to or as a consequence, direct or indirect, of Buyer's failure to satisfy its obligations owing on the Equipment Loan subsequent to the Closing Date.

Further Assurances.    Seller shall deliver other bills of sale, endorsements, assignments, releases, and other good and sufficient instruments of transfer, assignment, and conveyance and assumption, in form satisfactory to Buyer and its counsel, as shall be effective to convey to Buyer good and merchantable title in and to the Acquired Assets.

Effectiveness.    This Asset Purchase Agreement shall become effective upon satisfaction of the following conditions precedent:

---

[3] The Agreement should be consulted for all terms of the Sale.

[4] Joseph Kovach, is a member of Buyer.

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS – TORTUGO BREWING COMPANY, LLC**

(a)    entry of an order of the United States Bankruptcy Court for the Central District of California, Los Angeles Division with respect to Seller's bankruptcy case approving the transactions contemplated by this Agreement subject to overbid, including without limitation the sale of the Acquired Assets free and clear of all liens and security interests, other than liens securing the Equipment Loan;

(b)    consent to the assumption of the Equipment Loan by U.S. Bank Equipment Finance by Buyer; and

(c)    payment of the Purchase Price to Buyer.

The date that all conditions precedent have been satisfied and the Acquired Assets are made available to Buyer to possess, shall be referred to as the "**Closing Date**".

## THE FULL TERMS AND CONDITIONS OF THE SALE ARE INCLUDED IN THE APA ATTACHED HERETO AS EXHIBIT "A", AND SHOULD BE CONSULTED BY INTERESTED PARTIES

The proposed Sale of the Acquired Assets pursuant to the procedures on the timeline proposed herein represents the best opportunity to maximize the value of the Debtor's estate for all interested parties.  The Debtor's ability to consummate the proposed Sale as soon as possible is essential to maximizing the value of the estate going forward.

**As mentioned above, all of the Debtor' right, title and interest in all of the Acquired Assets shall be sold free and clear of any liens, security interests, claims, charges or encumbrances in accordance with §363 of the Bankruptcy Code.  The Debtor proposes that any such liens, security interests, claims, charges or encumbrances, shall attach to the amounts payable to the Debtor resulting from the Sale (the "Sale Proceeds"), and held by the Debtor, in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto, subject to any further order of the Court.[5]**

D.    **Overbid and Sale/Auction Procedures.**

---

[5] The Debtor believes it has 3 secured creditors who may assert a lien on the Acquired Assets. U.S. Bank Equipment Finance has a 1st purchase money lien on the Acquired Assets, and will be cured per the APA and the obligations assumed. U.S. Bank has a 2nd lien on the Acquired Assets of the Debtor and is owed approximately $59,170, and the Small Business Administration has a 3rd Lien on the Acquired Assets of the Debtor and is owed approximately $150,000. The Debtor has conducted a recent UCC search setting forth all liens against the Debtor. No other liens were found that assert an interest in the Acquired Assets.

13

1    The Debtor has and continues to solicit offers and has coordinated the process of informing

2    potential bidders and evaluating those offers received on the Debtor's behalf. In order to maximize

3    the greatest value for this estate and its creditors, **at the time of the hearing on approval of the**

4    **Sale**, parties offering to purchase the Acquired Assets shall have the opportunity to overbid the

5    purchase of the Acquired Assets on substantially the same or better terms as those set forth in the

6    Agreement.

7    The initial overbid will be ten thousand dollars ($10,000) cash plus assuming and curing

8    the obligations of U.S. Bank Equipment Finance estimated to be approximately $89,176.56 plus

9    accrued interest, over the offer of the Buyer or other amount set by the Bankruptcy Court

10   (**"Overbid"**), and the other obligations that Buyer has agreed to under the Agreement. In addition:

11   (a) all third party bids must be in form and substance substantially and materially similar to the bid

12   submitted pursuant to the Agreement; (b) any third party making an Overbid (**"Overbidder"**)

13   must submit to counsel of the Seller, by no later than five (5) business days before the hearing set

14   to approve the Sale, cash or a money order or a cashier's check made payable to "Kogan Law

15   Firm, APC Client Trust Account" in the amount of ten thousand dollars ($10,000), which amount

16   shall be paid by any successful Overbidder as a nonrefundable deposit and held by Seller in a trust

17   account pending closing of the sale transaction; and (c) at the time of the Sale, any Overbidder

18   must demonstrate the ability to pay the remaining portion of the purchase price (**"Remainder**

19   **Amount"**) and to successfully consummate the sale transaction.  Buyer shall have the right to

20   participate in any Overbid proceeding.

21   Furthermore, in order for each Qualified Bidder to present a "Qualifying Bid," the

22   following must occur:

23   (1) The Qualifying Bidder must submit a asset purchase agreement along with its deposit

24   (**"Modified Asset Purchase Agreement"**) which must contain a purchase price in an amount at

25   least equal to the sum of the Purchase Price in the Buyer Agreement plus $10,000;

26   (2) The Modified Asset Purchase Agreement must state that the bidder offers to purchase

27   all or some of the Assets upon the terms and conditions as set forth in the Buyer Agreement or

28   through an alternative structure on terms and conditions no less favorable to the Debtors than the

terms and conditions contained in the Buyer Agreement (as determined by the Debtor in their reasonable business judgment);

(3) The Modified Asset Purchase Agreement must state that the bidder is financially capable of consummating the transactions contemplated by the Modified Asset Purchase Agreement;

(4) The Modified Asset Purchase Agreement must state that the Qualified Bidder's offer is irrevocable until the Closing if such bidder is the Prevailing Bidder or if such bidder is the Back-Up Bidder (as defined below) until such time as outlined below;

(5) The Modified Asset Purchase Agreement must identify with particularity each and every executory contract and unexpired lease, the assumption and assignment or rejection of which is a condition to closing;

(6) The Modified Asset Purchase Agreement must fully disclose the identity of each entity that will be bidding for the Acquired Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(7) The Modified Asset Purchase Agreement must state that such bid does not contain any due diligence or financing contingencies of any kind other than contained in the Agreement and approval of the Sale by the Bankruptcy Court; and

(8) The Modified Asset Purchase Agreement must include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Asset Purchase Agreement.

**The Debtor shall have the exclusive right to determine whether a bid is a Qualifying Bid and shall notify bidders whether their bids have been recognized as such prior to the Auction.[6]**

**In the event that the Debtor timely receives more than one Qualifying Bid, the Court shall conduct the Auction with respect to the Assets at the hearing on the Motion.**

---

[6] All rights granted in favor of Debtor in these Bidding Procedures shall be exercised in accordance with its fiduciary obligations.

MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS – TORTUGO BREWING COMPANY, LLC

**D.**    <u>**As Is, Where Is.**</u>

The Sale of the Assets shall be on an "as is, where is" basis, without representations or warranties of any kind, nature or description by the Debtor or Debtor's estate, except as may be specifically set forth in the Agreement.

**F.**    <u>**Sale Approval Hearing.**</u>

The Prevailing Bid will be subject to approval by the Court at the hearing on the Motion..

**G.**    <u>**Closing Conditions and Deadlines.**</u>

The transactions contemplated hereby shall be consummated (the "**Closing**") on the third business day after the Sale Order becomes a final order (the "**Closing Date**") at a time and place mutually agreed upon by Buyer and Seller.  Notwithstanding anything to the contrary, Buyer may waive the "finality" with respect to the Sale Order and may specify a Closing date for any business day after entry of the Sale Order.  If Closing does not occur as scheduled, Buyer and Seller may mutually extend the Closing Date from time to time.  Any cancellation or non-extension of this Agreement by either party shall not prejudice any claims the canceling party may have for breach or non-performance of this Agreement.

**H.**    <u>**Failure to Consummate Purchase.**</u>

If an Auction is conducted, the party with the next highest or otherwise best Qualifying Bid at the Auction, as determined by the Debtors in the exercise of its business judgment, shall be required to serve as a back-up bidder (the "**Back-Up Bidder**").

Following the Sale Approval Hearing, if the Prevailing Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Prevailing Bidder, or provide the Final Qualification Packages, the Back-Up Bidder's bid will be deemed to be the new Prevailing Bid, and the Debtor will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Court upon at least 24 hours' notice to the Notice Parties (defined below).  In such case, the Prevailing Bidder's Deposit and, if applicable, its Additional Deposit, shall be dealt with in accordance with the terms of its Modified Asset Purchase Agreement, and the Debtors specifically reserve the right to seek all available damages from the defaulting Prevailing Bidder in accordance with the terms of that party's Asset Purchase

1  Agreement.

2  In the event that the Debtor fails to consummate a transaction with the Back-Up Bidder,

3  the Back-Up Bidder's Deposit shall be dealt with in accordance with the terms of its Asset

4  Purchase Agreement and the Debtor specifically reserve the right to seek all available damages

5  from the defaulting Back-Up Bidder in accordance with the terms of its Asset Purchase

6  Agreement.

7  **I.**  **Assumed Contracts.**

8  In order to effectuate the Sale of the Acquired Assets, the Debtor must convey to the Buyer

9  the Debtor's interest in the executory contracts and unexpired leases within the meaning of Section

10  365 of the Bankruptcy Code including the obligations of U.S. Bank Equipment Finance estimated

11  to be approximately $89,176.56 plus accrued interest (the **"Assumed Contracts"**).  Accordingly,

12  the Debtor seeks authority to assume and assign to Buyer certain Assumed Contracts, subject to:

13  (i) approval by the Bankruptcy Court; (ii) any other necessary approvals (i.e., Assumed Contracts

14  that cannot be assigned under applicable non-bankruptcy law absent the other party's consent, and

15  which restriction on assignment cannot be waived under the Bankruptcy Code); (iii) payment by

16  the Buyer of the costs required pursuant to sections 365(b)(1) (A) and 365(b)(1)(B) of the

17  Bankruptcy Code (the **"Cure Costs"**) as determined by an order entered by the Bankruptcy Court

18  (which order shall not have been stayed or appealed) and paid no earlier than thirty (30) days after

19  the Close or such time as determined by the Court, or the agreement of the Buyer and the counter-

20  party to such Assumed Contract; and (iv) Buyers provision of sufficient evidence of adequate

21  assurance of future performance under the applicable Assumed Contract(s), as required pursuant

22  to sections 365(b)(1)(c) and 365(f)(2)(B) of the Bankruptcy Code. Attached hereto and

23  incorporated herein as Exhibit "B" is the Debtors proposed Cure Amounts and the Assumed

24  Contracts.

25  The Sale Notice will list the Cure Costs, if any, that the Debtor believes to be owed for

26  each Assumed Contract as of the date the Sale Notice is mailed.  Each counter party to an

27  Assumed Contract will have up to the time provided under the Local Bankruptcy Rules for

28  objections to the Motion (the **"Objection Deadline"**) to object on any grounds, including the

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS –
TORTUGO BREWING COMPANY, LLC**

1  amount of the Cure Costs, to the assumption and assignment of the Assumed Contract to which it

2  is a party. All counter-parties who do not file with the Court and serve on the counsel for the

3  Debtor, counsel for Buyer, and the Office of the United States Trustee, on or before the Objection

4  Deadline, an objection to the assumption and assignment of an Assumed Contract or the Cure

5  Costs will be deemed to have consented to the assumption and assignment of such Assumed

6  Contract and the Cure Costs set forth in the Sale Notice or supplemental notice.

### III.

## THE COURT SHOULD ALLOW THE SALE OF THE ACQUIRED ASSETS TO THE

## BUYER

10      Section 363(b)(1) permits a trustee, or a debtor in possession, after notice and a hearing, to

11  "sell ..., other than in the ordinary course of business, property of the estate." 11 U.S.C.

12  § 363(b)(1). The standards for approval of a sale pursuant to Section 363(b)(1) require the

13  proponent of the sale to establish that:

14        (1)    a "sound business purpose justifies the sale;"

15        (2)    "accurate and reasonable notice" of the sale was provided;
           (3)    "the price to be paid is adequate, i.e., fair and reasonable;" and

16        (4)    "'good faith,' i.e., the absence of any lucrative deals with insiders, is present." In
re Industrial Valley Refrig. And Air Cond. Supplies, Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987).

17

18      As discussed below, the estate believes that all of the above requirements have been met.

19  Therefore, the Court should grant the Motion and permit the Debtor to sell the Acquired Assets to

20  the Buyer pursuant to the terms of the Agreement.

21  **A.**    **Sound Business Justification**

22      The Ninth Circuit Bankruptcy Appellate Panel in In re Walter, 83 B.R. 14 (9th Cir. BAP

23  1988), adopted a flexible, case by case test to determine whether the business purpose for the

24  proposed sale justifies disposition of property of the estate under Section 363(b). In Walter, the

25  court adopted the reasoning of the Fifth Circuit in In re Continental Air Lines, Inc., 780 F.2d 1223

26  (5th Cir. 1986), and the Second Circuit in In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983), and

27  articulated the criteria a bankruptcy court is to consider in deciding whether to approve or

28  disapprove the use or sale of estate property under Section 363(b):

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS –
TORTUGO BREWING COMPANY, LLC**

1
2
3
4
5
6
7
8
9

> Whether the proffered business justification is sufficient depends on the case. As the Second Circuit held in <u>Lionel</u>, the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the Debtor, creditors and equity holders, alike. He might for example, look to such relevant facts as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal environs and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

10
11
12

<u>Walter</u>, 83 B.R. at 19-20, <u>quoting</u> <u>Continental Air Lines, Inc.</u>, 780 F.2d at 1226, citing <u>Lionel</u>, 722 F.2d at 1071.

13
14
15
16
17
18
19
20
21

The facts of the instant case justify and substantiate the Debtor's business decision that the contemplated sale of the Acquired Assets is in the best interest of the estate and should be approved by this Court. The sales price was derived through arms-length negotiations and represents the fair market value for the Acquired Assets. The Debtor has attempted many different business solutions both prior to and after the filing of the Bankruptcy Case, however, the Sale has become the Debtors best alternative to maximize value for creditors. The Debtor cannot operate as a going concern without the infusion of additional working capital. The Debtor is unable to obtain lines of credit or any other form of traditional bank or institutional financing to fund its working capital needs.

22
23
24
25
26
27
28

The Business is composed of certain assets that are currently owned, leased or licensed by Seller. The core of the solution was at first a sale of all of the Debtors assets and an assignment of the Lease. Subsequent to the filing of the Bankruptcy Case, the Debtor determined that the best way to maximize value for its creditors and the estate was to conduct an extensive marketing effort for the Acquired Assets. Since that time, the Debtor has arranged to sell the Acquired Assets to Buyer. Therefore, Seller desires to sell, and Buyer desires to purchase, subject to the terms and conditions hereof and in accordance with Sections 363 and 365 of the Bankruptcy Code, certain of

19

1  the assets of Seller as described herein.

2         The proposed Sale of the Acquired Assets pursuant to the procedures on the timeline

3  proposed herein represents the best opportunity to maximize the value of the Debtor's estate for all

4  interested parties.  **The Debtor's ability to consummate the proposed Sale as soon as possible**

5  **is essential to maximizing the value of the estate going forward, and without approval on an**

6  **expatiated basis, the Debtor's alternative would be far worse for creditors of the estate. The**

7  **Sale gives creditors of the estate the certainty of payment in a very short time.** The foregoing

8  demonstrates that the sale of the Acquired Assets is justified by sound business purposes,

9  satisfying the first requirement for a sale under 11 U.S.C. § 363(b).

10  **B.      Fair and Reasonable Price**

11         For the purposes of Section 363(b), the requirement that a fair and reasonable price be

12  obtained for the property has been defined as requiring a price equaling at least 75% of the fair

13  market value of the property — absent extenuating circumstances.  See, e.g., In re Abbotts Dairies

14  of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); Willemain v. Kivitz, 764 F.2d 1019 (4th Cir.

15  1985); In re Karpe, 84 B.R. 926 (Bankr. M.D. Pa. 1988).  The Debtor believes that the offer is the

16  highest and best offer he will receive, particularly in light of the problems facing the vehicle

17  industry today.  The terms of sale are greater than the value the Buyer contends they are worth.

18  The Buyer, however, is willing to pay this price because of the unique opportunity to obtain and

19  use the Acquired Assets.  Thus, the Consideration is "fair and reasonable".

20         Furthermore, the Debtor is proposing to seek approval for the Sale subject to overbid.  The

21  overbid process will enable the Debtor to solicit and consider any offer for the Acquired Assets

22  that includes a purchase price in excess of the Purchase Price under the APA.  Thus, the Debtor

23  believes that it has negotiated the best available terms for the purchase of the Acquired Assets

24  pursuant to the APA, and that the purchase price that the Debtor will obtain for the Acquired

25  Assets pursuant to the Sale Procedures will be the highest and best value that the Debtor could

26  obtain.

27                                    **IV.**

28         **THE ACQUIRED ASSETS CAN BE SOLD FREE AND CLEAR OF LIENS**

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS –
TORTUGO BREWING COMPANY, LLC**

1    Under Section 363(f), a trustee or debtor in possession may sell property out of the

2    ordinary course of business "free and clear of any interest in such property of an entity other than

3    the estate if any one of the five conditions is met"

4    This section of the Bankruptcy Code has been interpreted to be disjunctive, rather than the

5    conjunctive.  Thus, the Debtor need only demonstrate that one of the above conditions exists.  In

6    re Elliot, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988).  As discussed below, the facts and

7    circumstances of this case support the conclusion that the Acquired Assets can be sold free and

8    clear of any liens, claims, or interests pursuant to Section 363(f).

9    **A.    Section 362(f)(2)**

10    The Acquired Assets may be sold free and clear of the liens against it because the entities

11    with interests in the Acquired Assets, other than the bankruptcy estate, consent or will be paid by

12    Buyer.  The Debtor has notified all interested parties of the sale through the Notice of Motion. **The**

13    **Debtor believes there are no parties who will object to the sale under the terms of the APA.**

14    If there is no objection, the parties will be deemed to have consented to the sale of the Acquired

15    Assets.  See Veltman v. Whetzal, 93 F.3d 517 (8th Cir. 1996) (failure to object to proposed sale,

16    coupled with agreement authorizing sale free of interest, constituted consent); Citicorp

17    Homeowners Services, Inc. v. Elliot, 94 B.R. 343 (E.D. Pa. 1988) (implied consent found);

18    Hargrave v. Pemberton, 175 B.R. 855 (Bankr. D. N.J. 1994) (failure to object to notice of sale or

19    attend hearing deemed consent to sale for purposes of Section 363); In re Shary, 152 B.R. 724

20    (Bankr. N.D. Ohio 1993) (state's failure to object to transfer of liquor license constituted consent

21    to sale).  **Moreover, the Debtor proposes that any such liens, security interests, claims,**

22    **charges or encumbrances, shall attach to the amounts payable to the Debtor resulting from**

23    **the Sale be held by the Debtor, in the same order of priority and subject to the rights, claims,**

24    **defenses, and objections, if any, of all parties with respect thereto, subject to any further**

25    **order of the Court.** Thus, pursuant to Section 363(f)(2), the Debtor may sell the Acquired Assets

26    of the estate free and clear of any interest of entities other than the bankruptcy estate because they

27    will be deemed to have consented to the sale of the Acquired Assets if they make no objections to

28    the sale. No objections by secured creditors are anticipated.

**B.**    **Section 363(f)(3)**

Under Section 363(f)(3), the Debtor may sell property, pursuant to Section 363(b), free and clear of any interest in that property provided that such interest is a lien, and the price at which such property is to by sold is greater than the aggregate value of all liens on such property. This provision requires the court to look not merely to the value of the lien of the objecting creditor, but to whether the estate has any equity in the property. Collier on Bankruptcy § 363.06[4]. Thus, the Sale can be authorized since it has been shown that the Acquired Assets are being sold at fair market value, and proceeds will be paid to the lien holders according to their respective interests up to the value of the Acquired Assets or such obligations will be paid by Buyer. Moreover, the Debtor proposes that any such liens, security interests, claims, charges or encumbrances, shall attach to the amounts payable to the Debtor resulting from the Sale be held by the Debtor, in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto, subject to any further order of the Court. **The Debtor believes there are no parties who will object to the terms of the APA.**[7]

**C.**    **Section 363(m) – Good Faith**

The Court should hold that the Buyer is a good faith purchaser entitled to the protections afforded a purchaser pursuant to Section 363(m).

Section 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

Pursuant to Section 363(m), a good faith purchaser is one who buys in good faith and for

---

[7] The Debtor believes it has 3 secured creditors who may assert a lien on the Acquired Assets. U.S. Bank Equipment Finance has a 1st purchase money lien on the Acquired Assets, and will be cured per the APA and the obligations assumed. U.S. Bank has a 2nd lien on the Acquired Assets of the Debtor and is owed approximately $59,170, and the Small Business Administration has a 3rd Lien on the Acquired Assets of the Debtor and is owed approximately $150,000. The Debtor has conducted a recent UCC search setting forth all liens against the Debtor. No other liens were found that assert an interest in the Acquired Assets.

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS – TORTUGO BREWING COMPANY, LLC**

1   value. Lack of good faith is shown by fraud, collusion between the purchaser and the trustee, or

2   an attempt to take grossly unfair advantage of other bidders. <u>In re Ewell</u>, 958 F.2d 276, 279 (9th

3   Cir. 1992). The Buyer has paid the fair market value for the Acquired Assets and acted in good

4   faith. Moreover, the Buyer has no connections to the Debtor. Therefore, the Court should find that

5   the Buyer is a good faith purchaser pursuant to Section 363(m).

6          For all of the reasons set forth above, the Debtor believes that the sale of the Acquired

7   Assets free and clear of liens, claims or interests is proper pursuant to Section 363(f).

8                                               **V.**

9   **ASSUMPTION AND ASSIGNMENT OF LEASES AND EXECUTORY CONTRACTS IS**

10                                       **APPROPRIATE**

11         Section 365 of the Bankruptcy Code authorizes a debtor in possession to assign an

12  executory contract or unexpired lease of nonresidential real property subject to the Court's

13  approval. The assumption or rejection of an unexpired lease by a debtor is subject to review under

14  the business judgment standard. <u>See NLRB v. Bildisco & Bildisco</u>, 465 U.S. 513, 523 (1984);

15  <u>Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R.</u>, 318 U.S. 523,

16  550 (1943). In the Ninth Circuit, in order to assume or reject an executory contract or unexpired

17  lease, a debtor need only show that its decision to assume, in its "business judgment," is in the

18  economic best interest of such debtor. In the Debtors' business judgment, it is in the best interests

19  of its estate to assume or reject the Assumed Contracts and assign them to the Buyer. If the

20  debtor's business judgment has been reasonably exercised, a court should approve the assumption

21  or rejection of an executory contract, including an unexpired lease. <u>See also In re Claremont</u>

22  <u>Acquisition Corp., Inc.</u>, 186 B.R. 977,990 (C.D. Cal. 1995) (allowing assumption and assignment

23  of an automobile franchise agreement where there was a nonmonetary default).

24         The Sale Notice and any supplemental notice will advise the counter parties to the Assumed

25  Contracts of the Cure Costs, if any that the Debtor believes would need to be satisfied to assume

26  the Assumed Contracts. To the extent that any counter-party objects to the Cure Costs set forth

27  therein (or to any other aspect of the proposed assumption and assignment), such party will have

28  the opportunity to file an objection, which likely will be resolved at or before the Sale Hearing,

1  and which will be resolved prior to the effective date of the assumption (or the Assumed Contract

2  will not be assumed).  Thus, the Debtor will satisfy the statutory requirements for assumption, and

3  the Court should approve the assumption of the Assumed Contracts as a proper exercise of the

4  Debtor's business judgment.

5       The Debtor submits, and will demonstrate at the hearing on this Motion, that there are

6  adequate business justifications for the assumption and assignment and the payment of the cure

7  amount on the Assumed Contracts or rejection, and that all requirements to assumption and

8  assignment, including payment of the Cure amount and adequate assurance of future performance

9  by the Buyer have been met.

10  **A.**    **The Court Should Approve The Assumption By The Debtor Of The Assumed**

11           **Contracts**

12       In order to effectuate the Sale of the Acquired Assets, the Debtor must convey to the Buyer

13  the Debtor's interest in the Assumed Contracts.  Accordingly, the Debtor seeks authority to assume

14  the Assumed Contracts of the obligations of U.S. Bank Equipment Finance estimated to be

15  approximately $89,176.56 plus accrued interest. **The Buyer will pay the cure amounts.** In

16  assuming the Assumed Contracts, the Buyer will promptly cure defaults, if any, as required by

17  Section 365(b) of the Bankruptcy Code, and will provide adequate assurance of future

18  performance by the Buyer to whom the Assumed Contracts are being assigned.

19       In the Debtor's business judgment, it is in the best interest of its estate to assume the

20  Assumed Contracts and assign each of these agreements to the Buyer.  The assumption and

21  assignment of the Assumed Contracts is an integral part of the Sale and should be approved by the

22  Court.

23       **1.**    **The Debtor Has A Sound Business Purpose For Assuming The Assumed**
                **Contracts.**

24

25       Under Bankruptcy Code section 365(a), a debtor generally "may assume or reject any

26  executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Though not expressly

27  stated in section 365(a), it is well settled that a court should authorize the assumption of an

28  executory contract when there is a "sound business purpose" that justifies the requested action.

1  See, e.g., In re G.I. Indus., 204 F.3d 1276 (9th Cir. 2000); In re Klein Sleep Prods., 78 F.3d 18 (2d

2  Cir. 1996). In essence, this test amounts to a "business judgment test." In re Sharon Steel Corp.,

3  872 F.2d 36, 40 (3rd Cir. 1989); Richmond Leasing Co. v. Capitol Bank, N.A., 762 F.2d 1303 (5th

4  Cir. 1985); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery

5  Ward Holding Corp.), 242 B.R. 147 (D. Del. 1999)

6      A debtor satisfies the "business judgment" test when it decides, in good faith, that the

7  assumption may benefit the estate. In re FCX, Inc., 60 B.R. 405, 411 (E.D.N.C. 1986); In re

8  Chipwich, Inc., 54 B.R. 427, 430-31 (Bankr. S.D.N.Y. 1985); Comm'l Fin. Ltd. v. Hawaii

9  Dimensions, Inc. (In re Hawaii Dimensions, Inc.), 47 B.R. 425, 427 (D. Haw. 1985). Bankruptcy

10 courts generally approve a debtor's decision on assumption absent a showing of bad faith, abuse

11 of discretion, or a clear demonstration that the assumption or rejection will not benefit the estate or

12 creditors. In re Prime Motors Inns, 124 B.R. 378 (Bankr. S.D. Fla. 1991); FCX, 60 B.R. at 411;

13 Chipwich, 54 B.R. at 430-31.

14      In a situation where a debtor is assuming a contract in connection with a sale transaction

15 pursuant to which the contract will be assigned, the scope of review should be even more limited

16 because of the negligible exposure to the estate. Where the assumption is solely to facilitate

17 assignment, the estate's exposure liability is limited to any cure amount required, and there is no

18 potential for administrative liability arising from and after the effective date of the assignment.

19 See 11 U.S.C. § 365(k).

20      Even without this deference, the Debtor's decision to assume the Assumed Contracts is

21 amply supported by sound business reasons. The assumption of the Assumed Contracts is a

22 crucial part of the sale of the Acquired Assets. The assumption and assignment of the executory

23 obligations of U.S. Bank Equipment Finance, in large part, necessary to ensure that the Sale will

24 close, and the Successful Bidder will be able to utilize the Acquired Assets. Thus, sufficient

25 business justification exists to permit the assumption and assignment of the Assumed Contracts.

26 **2.    The Debtor Will Satisfy The Other Provisions Of Section 365 of the Bankruptcy Code Regarding Assumption Of The Assumed Contracts.**

27      In addition to the business judgment test, section 365(b)(1) of the Bankruptcy Code

28

25

provides that:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee

> (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default;

> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss resulting from such default; and

> (C)    provides adequate assurance of future performance under such contract or lease.

If there is no default under the applicable Assumed Contract, then the Debtor is not required to satisfy the provisions section 365(b) of the Bankruptcy Code in order to assume such contract. See, e.g., In re Commonwealth Mortgage Co., 149 B.R. 4, 7 8 n.24 (Bankr. D. Mass. 1992) ("Because the Court finds that there has been no default under the Servicing Agreement, the cure and the adequate assurance provisions of § 365(b) are inapplicable.").

The Sale Notice and any supplemental notice will advise the counter-parties to the Assumed Contracts of the Cure Costs, if any, that the Debtor believes would need to be satisfied to assume the Assumed Contracts.  To the extent that any counter-party objects to the Cure Costs set forth therein (or to any other aspect of the proposed assumption and assignment), such party will have the opportunity to file an objection, which likely will be resolved at or before the Sale Hearing, and which will be resolved prior to the effective date of the assumption (or the Assumed Contract will not be assumed).  Thus, the Debtor will satisfy the statutory requirements for assumption, and the Court should approve the assumption of the Assumed Contracts as a proper exercise of the Debtor's business judgment.

**B.**    **The Court Should Approve The Assignment Of The Assumed Contracts To the Successful Bidder As The Successful Bidder Can Provide Adequate Assurance Of Future Performance.**

In order to assign a contract or lease, a debtor must assume the contract or lease under section 365(b) of the Bankruptcy Code and provide adequate assurance of future performance. See 11 U.S.C. § 365(f) (2).  The Debtors will satisfy the requirements for assumption and

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS – TORTUGO BREWING COMPANY, LLC**

1  assignment pursuant to section 365(f)(2) of the Bankruptcy Code.

2      First, the Debtor will satisfy the assumption criteria as discussed above. Second, the

3  Debtor anticipates that the financial capability of the Successful Bidder and its willingness to

4  perform the post-assignment obligations under the Assumed Contracts will constitute sufficient

5  "adequate assurance of future performance" to justify the proposed assumption and assignment.

6  See, e.g., In re Tech Hifi, Inc., 49 B.R. 876, 879 (Bankr. D. Mass. 1985) ("Adequate assurance of

7  future performance with respect to the source of rent to be paid means that the proposed assignee

8  has the ability to satisfy the financial obligations imposed by the lease. An absolute guarantee,

9  such as a letter of credit, is not required to meet this standard."); In re PPK Enters., Inc., 235 B.R.

10  597, 603 (Bankr. E.D. Tex. 1999); In re THW Enters., Inc., 89 B.R. 351, 357 (Bankr. S.D.N.Y.

11  1988). If the debtor's business judgment has been reasonably exercised, a court should approve the

12  assumption or rejection of an executory contract, including an unexpired lease. See also In re

13  Claremont Acquisition Corp., Inc., 186 B.R. 977,990 (C.D. Cal. 1995) (allowing assumption and

14  assignment of an automobile franchise agreement where there was a nonmonetary default).

15      In addition, Buyer will provide evidence as necessary its ability to provide adequate

16  assurance of future performance. Finally, as part of any Qualified Offer, a Potential Purchaser

17  must submit evidence of its financial ability to close the Sale and provide adequate assurances of

18  performance. Accordingly, the Debtor respectfully requests that the Court determine that at the

19  time of the Sale Hearing, the Debtor and the Successful Bidder will have complied with the

20  requirements of section 365(f) (2) of the Bankruptcy Code, and approve the assumption and

21  assignment of the Assumed Contracts to the Successful Bidder.

22                      **VI.**

23      **WAIVER OF STAY PURSUANT TO FRBP 6004(h) and 6006(d)**

24      Federal Rules of Bankruptcy Procedure ("FRBP") 6004(h) and 6006(d) provide that, unless

25  the Court orders otherwise, an order authorizing the Sale and the assignment of the Assumed

26  Contracts will be stayed for fourteen (14) days after entry. Here, the Debtor requests that the Court

27  waive the stay pursuant to FRBP 6004(h) and 6006(d). The Sale is premised on a prompt closing,

28  particularly in light of the Debtor's liquidity concerns. This key timing component to the

1   transaction means that the parties cannot afford to wait the automatic fourteen (14) days

2   contemplated by FRBP 6004(h) and 6006(d).

3                                      **VII.**

4                                  **CONCLUSION**

5          For the foregoing reasons, the Debtor respectfully requests that the Motion be granted in

6   all respects, and for such other and further relief as the Court deems just and proper.

7   DATED: May 29, 2022                    **KOGAN LAW FIRM, APC**
                                           Michael S. Kogan
8

9
                                    By:   /s/ Michael S. Kogan
10                                        Michael S. Kogan
                                          Attorneys for Debtor
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                           28

**DECLARATION OF KEVIN O'MALLEY**

I, Kevin O'Malley, do hereby declare:

1.     I make this declaration in support of the Motion of Debtor for Sale of Property Free and Clear of Liens and Assumption and Assignment of Executory Contracts of the Debtors Business Assets – Tortugo Brewing Company, LLC (the **"Motion"**) in the bankruptcy case of Indie Brewing, LLC (the "**Debtor**"), the debtor and debtor in possession herein. I have personal knowledge of the facts set forth herein, if called as a witness, I could and would competently testify under oath to these facts set forth herein. If any facts are based upon information and belief, I so state.

2.     I am the Manager of the Debtor, the debtor and debtor in possession herein.  In my capacity as the Manager of the Debtor, I am readily familiar with the Debtor's day-to-day operations, business affairs and books and records.  I have personal knowledge of how the Debtor's records are compiled.  The records of the Debtor are made in the ordinary course of the Debtor's business at or near the time of which they are a record, by such person or persons who owe a business duty to the Debtor to make and maintain such records.  The records of the Debtor are made at or near the time of the occurrence of the event or events of which they are a record.  I have personally reviewed my employer's records and files as they relate to the matters raised in this Declaration and I make this Declaration based upon that personal review.

3.     Pursuant to the Motion, the Debtor seeks an order, pursuant to Sections 363 and 365 of Title 11 of the Bankruptcy Code (the "**Bankruptcy Code**"), approving the sale of certain of the Business assets (the "**Acquired Assets**"), and assumption and assignment of certain designated executory contracts free and clear of all liens, claims and interests to Tortugo Brewing Company, LLC (the **"Buyer"**), or its assignee pursuant to the Asset Purchase Agreement (the "**Agreement**" or "APA")[8] entered into between the Buyer and the Debtor. The Buyer owns a business similar to the Debtor's, which is well known both to the Debtor and other interested parties. The Buyer's business is performing well financially, and the Debtor is satisfied that the

---

[8] Unless otherwise stated, defined terms are as set forth in the APA.

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS – TORTUGO BREWING COMPANY, LLC**

1    Buyer has the financial capacity to complete the sale and capital to operate and perform on the

2    obligations on the Acquired Assets, and assume the executory contract for the Acquired Assets.

3    The Debtor has received financial information concerning the Buyers credit worthiness. The sale

4    will be noticed to all previous interested parties to the Acquired Assets, and to creditors and other

5    interested parties. The Debtor believes that all burdens of establishing a sound business

6    justification for the sale of the Acquired Assets have been met. The Debtor believes that the

7    purchase price (the "**Consideration**") maximizes the value of the Acquired Assets to the estate.

8    The terms of the sale with the Buyer have been negotiated at arms-length and the consideration for

9    purchase of the Acquired Assets is fair and reasonable, and represents the fair market value for the

10    Acquired Assets. Therefore, the Motion should be approved. If there are over bidders for the

11    purchase of the assets, the Debtor requests that the procedures outlined herein are approved.

12       4.      On or about May 9, 2022, the Debtor commenced this case by filing a Voluntary

13    Petition under Chapter 11, Title 11, United States Code (the "**Petition Date**"). The Debtor is

14    operating its business and managing its financial affairs as a debtor in possession pursuant to

15    Sections 1107 and 1108 of the Bankruptcy Code.

16       5.      The Debtor operated a craft brewery and tasting room (the "**Business**") in the

17    Boyle Heights section of Los Angeles from 2015 through 2022. It was the first craft brewery on

18    the eastside of LA since the 70s. Since opening, the Business has grown and attracted a devoted

19    following of local customers as well as people looking for a comfortable space to unwind near

20    downtown Los Angeles. It had over 200 accounts throughout Los Angeles and was served at

21    Dodger Stadium in 2021. The Debtor encouraged many local food vendors and merchants to do

22    their first "pop up" at the Business and as a result, several small businesses launched from the

23    welcoming atmosphere created by the Debtor.

24       6.      The Debtor has been profitable in the past, and is very well regarded, however, a

25    number of events impacted its ability to continue profitable operations. **First**, due to the COVID

26    Pandemic its Business was severely impacted. In March 2020, all of the City of Los Angeles went

27    dark. The COVID Pandemic, unprecedented in scope and destruction, spawned a massive and

28

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS –
TORTUGO BREWING COMPANY, LLC**

severe government response that completely shuttered the Debtors operations and in fact prohibited similar operations in the City of Los Angeles. From March 2020 through June 2020 the Debtor's tasting room (which accounted for 65% of its revenue in 2019) was shut down other than selling beer to go. In June 2020, it appeared that the City of Los Angeles would once again be opened up for activities such as the brewery operation, unfortunately, the COVID-19 Pandemic shortly took a turn for worse, and on July 1, 2020, the State of California and then the City of Los Angeles, issued temporary closure of indoor restaurant and brewery operations, including the Debtor. From March 2020 through March 2021 the Debtor's tasting room was only open for a handful of weeks (with strict regulation) and once permitted to open in March 2021, the Debtor was only able to operate outdoors and at 50% of capacity. Thus, from March 2020 through the February 2022 (the "**Pandemic Period**") the Debtor was either closed or required to operate at only 50% capacity. Against this backdrop, the Debtor struggled to survive.

7.      **Second**, prior to and throughout the COVID Pandemic and presently the Debtor has had a number of disputes with its landlord, 2301 East 7th Street, LLC (the "**Landlord**"). On or about June 30, 2014, Landlord and the Debtor entered into a written lease for the premises located at 2301 East 7th Street, #100C (the "**Lease**") in which the Business operated. On or about January 8, 2020, the Landlord and the Debtor entered into an amendment to the Lease (the "**First Lease Amendment**"), which increased the term of the Lease for five years, commencing February 19, 2020 and ending February 18, 2025 (the "**Term**"). The First Lease Amendment provided for monthly base rent in the amount of the $13,800 plus a proportionate amount for various property expenses (the "**Rent**").

8.      During March 2020, Los Angeles County issued an Executive Order that imposed a temporary moratorium on evictions for non-payment of rent by residential or commercial tenants impacted by the COVID Pandemic (the "**Moratorium**"). The Moratorium has been extended through December 2022. Pursuant to the Moratorium which the Debtor took advantage of, commercial tenants, such as the Debtor with less than 9 employees have until January 31, 2023 to repay any past due rent that accrued from March 2020 to January 2022. Notwithstanding the

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS – TORTUGO BREWING COMPANY, LLC**

Moratorium and the relief from Rent it provided, the Debtor, in good faith, paid Rent to Landlord during the Pandemic Period in an amount equal to approximately $168,000 (or one year's Rent).

9.      In September 2020, given the impact of the COVID Pandemic on its operations, and the horrid business conditions that persisted, the Debtor began actively marketing its Business and related assets in hopes of entering into a sale to allow it to extricate itself from its mounting liabilities and to satisfy its creditors.

10.     By October 2020, the Debtor entered into negotiations with Alan Newman of Alchemy & Science in Burlington, Vermont, as a prospective buyer for the Business (the "**First Buyer**"). The First Buyer and Debtor delivered a letter of intent to the Landlord however the sale to the First Buyer never occurred due to resistance of the Landlord to entertain any modifications to the Lease despite the realities of the COVID Pandemic and its impact on the Debtor's Business. From November 2020 through January 2021, the Debtor contacted the Landlord on multiple occasions to discuss additional potential buyers and sales. These contacts were either not responded to, or the Debtor was otherwise instructed that the Landlord refused to consent to any sale or modifications to the Lease.

11.     In March 2021, the Landlord, in violation of the Moratorium, sued the Debtor and its members for failure to pay rent during the Pandemic. The lawsuit resulted in even further economic duress of the Debtor and its members at a time when it was losing a significant amount of money and barely operating.

12.     On December 2, 2021, the Debtor, after a for sale process that produced three term sheets from three different potential buyers, signed a term sheet with a successful and existing brewery, Los Angeles Ale Works, LLC (the "**Second Buyer**"). The Second Buyer operated a brewery and tasting room in Hawthorne for six years, was in the process of opening another location in Culver City which has now opened, and was interested in the Business because it provided a turn-key opportunity for expansion in the downtown area. The Debtor and the Second Buyer entered into a term sheet pursuant to which the Second Buyer would acquire the Business (the "**Sale**"). The proceeds of the Sale would have paid the Landlord in full as well as all the

32

Debtors creditors (including the Small Business Administration, the IRS and other governmental entities) while the members and equity holders of the Debtor were not to receive any proceeds. The Sale was being conducted completely for the benefit of the creditors and the Landlord was receiving almost 50% of the Sale proceeds.

13.    On December 2, 2021, the Debtor provided a copy of the executed term sheet to the Landlord. It requested a copy of the Lease cure amount and an assignment. From approximately December 2 to December 13, 2021, the Debtor continued to inform the Landlord that it was losing cash, and that it needed to know the Landlord's position, as it did not want to lose the Second Buyer.

14.    On December 13, 2021, the Landlord informed the Debtor that it would not consider a Lease assignment or modification until the Lease defaults were cured. The next day, the Debtor again informed the Landlord that it did not have sufficient cash to cure the default and the only way that it could cure the Lease defaults was through the Sale. The Debtor explained that it had found an excellent and well-qualified buyer for the Business, any Lease defaults would be cured in full upon closing of the Sale via an escrow payment, and that all the Landlord needed was to consent to an assignment which would cure every default and provide the Landlord with full payment. Absent this, the Debtor explained that it would have no choice but to seek bankruptcy protection.

15.    On February 28, 2022, due to the devastating effects of the COVID Pandemic, the Debtor ceased operating the Business to the public, except for a very small and limited distribution of beer cans sold through online media.

16.    On March 29, 2022, the Debtor informed the Landlord that the Sale between the Second Buyer and the Debtor was in the final stages of lender approval, and that it expected to close on approximately April 15, 2022, at which point the amount necessary to cure all Lease defaults and pay the Landlord's legal fees would be placed into escrow and the assignment would be sent to the Landlord.

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS – TORTUGO BREWING COMPANY, LLC**

17.     On April 14, 2022, the Debtor provided the Landlord with an executed purchase agreement (the "**APA**") with the Second Buyer for the Sale, along with a draft assignment that provided for: (a) repayment in full of all amounts owing to the Landlord (including all of its legal fees for its lawsuit against the Debtor and its managing members), (b) resolution and release of all outstanding claims, (c) a new tenant for the remainder of the term of the lease, and (d) all existing personal guarantees to remain in place. The Debtor explained that the Sale was expected to close on April 25, 2022, and that the Second Buyer was an established brewery that operated for several years in Los Angeles, and that the COVID Pandemic had forced the Debtor to close. The Debtor further stated that if the Sale did not close, it would have no choice but to file for bankruptcy. The Landlord then thwarted the Sale by refusing to consent to an assignment that would have provided it with full repayment and a new tenant. On April 28, 2022, the Second Buyer informed the Debtor that it was no longer interested in buying the Business and terminated the APA and the Sale because it could not comprehend why the Landlord would reject an assignment that paid it in full and gave it a new tenant for the remainder of the Lease with no effort, cost or assistance from the Landlord.

18.     The effects of the COVID Pandemic, coupled with the realization that there was nothing else to offer the Landlord to obtain its consent resulted in the Debtor having no alternative but to file this case.  Without the Sale proceeds, the Debtor has no ability to pay its creditors other than a liquidation sale which would result in likely less than the proceeds of the Sale. As a result, the Debtor commenced its Chapter 11 bankruptcy case. The Debtor believes that through liquidation of its assets and its claims against the Landlord, it will be able to make a significant distribution to its creditors on their claims.

19.     As set forth above, the Debtor has been attempting to sell its assets for a number of years. In fact, the Debtor had a number of purchase agreements to purchase all of its assets, however in each instance the sales required the assignment of the lease which was withheld by the Landlord. Consequently, the Debtor does not believe it can sell all of its assets to a purchaser who

34

would operate in its present location. Therefore, the Debtor has marketed individual or groups of its assets to many potential purchasers to obtain the best and highest value for those assets.

20.     The Debtor's principals have been in the brewery business in Los Angeles for a significant period and are very familiar with virtually every player in the field. Consequently, the principals reached out through the industry, and contacted the LA Brewers Guild (**"Brewers Guild"**) email list with over 88 local breweries included and has daily emails and threads relevant to the local guild members) with the attached equipment spreadsheet (which includes the equipment included in the sales agreement). Have informed the Brewers Guild the Debtor will be having an open house Wednesday May 25th from 10-3pm where breweries can come view the equipment and make a bid (including equipment subject to the agreement). Further the Debtor has received sixteen (16) emails of interest so far with the majority saying they will attend the open house on May 25th to view the Acquired Assets. The principals also generally have made it known throughout the industry that they would be agreeable to a sale, and believe they have reached any and all potential purchasers regarding the sale of the Acquired Assets.

21.     **The Debtor has determined that the best way to maximize value for its creditors and the estate is to sell the Acquired Assets to Buyer.** The Debtor conducted an extensive marketing effort for the Acquired Assets. Therefore, the Seller desires to sell, and Buyer desires to purchase, subject to the terms and conditions hereof and in accordance with Sections 363 and 365 of the Bankruptcy Code, the Acquired Assets as described in the APA.

22.     The proposed Sale of the Acquired Assets pursuant to the procedures on the timeline proposed herein represents the best opportunity to maximize the value of the Debtor's estate for all interested parties. **The Debtor's ability to consummate the proposed Sale as soon as possible is essential to maximizing the value of the estate going forward. The Sale gives creditors of the estate the certainty of payment in a very short time.**

23.     A summary of the relevant terms are as follows[9]:

---

[9] The Agreement should be consulted for all terms of the Sale.

35

Purchase of Assets.   Upon satisfaction of the Effective Conditions, subject to the terms and conditions of this Agreement, Seller hereby sells, assigns, transfers, conveys and delivers to Buyer (and Buyer hereby purchases), free and clear of any liens and security interests (other than liens securing the Equipment Loan (as defined below) all of Seller's right, title and interest in, to and under all of the equity listed on Schedule I attached hereto (collectively, the "*Acquired Assets*").

Purchase Price.   In consideration for the sale and transfer of the Acquired Assets, Buyer hereby agrees (a) to pay to Seller, $7,200 in immediately available funds (the "*Purchase Price*"), and (b) assume all obligations owing by Seller in connection with the Equipment Loan (as defined below).

Liabilities.    Buyer hereby assumes all debts, liabilities, obligations and responsibilities owing pursuant to Contract No. 550-0063813-000 entered into by Seller and U.S. Bank Equipment Finance (the "*Equipment Loan*") and agrees to make all payments with respect to such contract after the Effective Date.    Seller hereby represents and warrants that the amount of outstanding liabilities and obligations owing pursuant to the Equipment Loan as of the date hereof is approximately $89,176.56 plus accrued interest.

Indemnification.  Buyer and Joseph Kovach ("**Kovach**")[10] hereby acknowledge that each Member has personally guaranteed the obligations owing by Seller under the Equipment Loan. To facilitate the transactions set forth herein, each Member has agreed to remain as a personal guarantor on the Equipment Loan subsequent to the Closing Date.  In consideration for the Members' agreement to remain personally liable on the Equipment Loan, Buyer and Kovach hereby indemnify, defend and hold harmless each Member for and from and against any and all claims, demands, liabilities, obligations, losses, damages, penalties, fines, actions, judgments, suits, costs, charges, expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel which may be imposed on, incurred by, or asserted against any Member arising out of or in any way relating to or as a consequence, direct or indirect, of Buyer's failure to satisfy its obligations owing on the Equipment Loan subsequent to the Closing Date.

Further Assurances.   Seller shall deliver other bills of sale, endorsements, assignments, releases, and other good and sufficient instruments of transfer, assignment, and conveyance and assumption, in form satisfactory to Buyer and its counsel, as shall be effective to convey to Buyer good and merchantable title in and to the Acquired Assets.

Effectiveness.   This Asset Purchase Agreement shall become effective upon satisfaction of the following conditions precedent:

(a)    entry of an order of the United States Bankruptcy Court for the Central District of California, Los Angeles Division with respect to Seller's bankruptcy case approving the transactions contemplated by this Agreement subject to overbid, including without limitation the sale of the Acquired Assets free and clear of all liens and security interests, other than liens securing the Equipment Loan;

---

[10] Joseph Kovach, a member of Buyer.

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS –
TORTUGO BREWING COMPANY, LLC**

(b)    consent to the assumption of the Equipment Loan by U.S. Bank Equipment Finance by Buyer; and

(c)    payment of the Purchase Price to Buyer.

25.    The date that all conditions precedent have been satisfied and the Acquired Assets are made available to Buyer to possess, shall be referred to as the ***"Closing Date"***.

**THE FULL TERMS AND CONDITIONS OF THE SALE ARE INCLUDED IN THE APA ATTACHED HERETO AS EXHIBIT "A", AND SHOULD BE CONSULTED BY INTERESTED PARTIES**

26.    The proposed Sale of the Acquired Assets pursuant to the procedures on the timeline proposed herein represents the best opportunity to maximize the value of the Debtor's estate for all interested parties. The Debtor's ability to consummate the proposed Sale as soon as possible is essential to maximizing the value of the estate going forward.

27.    **As mentioned above, all of the Debtor' right, title and interest in all of the Acquired Assets shall be sold free and clear of any liens, security interests, claims, charges or encumbrances in accordance with §363 of the Bankruptcy Code. The Debtor proposes that any such liens, security interests, claims, charges or encumbrances, shall attach to the amounts payable to the Debtor resulting from the Sale (the "Sale Proceeds"), and held by the Debtor, in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto, subject to any further order of the Court.[11]**

28.    The Debtor has and continues to solicit offers and has coordinated the process of informing potential bidders and evaluating those offers received on the Debtor's behalf. In order to maximize the greatest value for this estate and its creditors, **at the time of the hearing on approval of the Sale**, parties offering to purchase the Acquired Assets shall have the opportunity

---

[11] The Debtor believes it has 3 secured creditors who may assert a lien on the Acquired Assets. U.S. Bank Equipment Finance has a 1st purchase money lien on the Acquired Assets, and will be cured per the APA and the obligations assumed. U.S. Bank has a 2nd lien on the Acquired Assets of the Debtor and is owed approximately $59,170, and the Small Business Administration has a 3rd Lien on the Acquired Assets of the Debtor and is owed approximately $150,000. The Debtor has conducted a recent UCC search setting forth all liens against the Debtor. No other liens were found that assert an interest in the Acquired Assets.

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS – TORTUGO BREWING COMPANY, LLC**

1  to overbid the purchase of the Acquired Assets on substantially the same or better terms as those

2  set forth in the Agreement.

3       29.    The initial overbid will be ten thousand dollars ($10,000) cash plus assuming and

4  curing the obligations of U.S. Bank Equipment Finance estimated to be approximately $89,176.56

5  plus accrued interest, over the offer of the Buyer or other amount set by the Bankruptcy Court

6  (**"Overbid"**), and the other obligations that Buyer has agreed to under the Agreement. In addition:

7  (a) all third party bids must be in form and substance substantially and materially similar to the bid

8  submitted pursuant to the Agreement; (b) any third party making an Overbid (**"Overbidder"**)

9  must submit to counsel of the Seller, by no later than five (5) business days before the hearing set

10  to approve the Sale, cash or a money order or a cashier's check made payable to "Kogan Law

11  Firm, APC Client Trust Account" in the amount of ten thousand dollars ($10,000), which amount

12  shall be paid by any successful Overbidder as a nonrefundable deposit and held by Seller in a trust

13  account pending closing of the sale transaction; and (c) at the time of the Sale, any Overbidder

14  must demonstrate the ability to pay the remaining portion of the purchase price (**"Remainder**

15  **Amount"**) and to successfully consummate the sale transaction. Buyer shall have the right to

16  participate in any Overbid proceeding.

17       30.    Furthermore, in order for each Qualified Bidder to present a "Qualifying Bid," the

18  following must occur:

19      (1) The Qualifying Bidder must submit a asset purchase agreement along with its deposit

20  (**"Modified Asset Purchase Agreement"**) which must contain a purchase price in an amount at

21  least equal to the sum of the Purchase Price in the Buyer Agreement plus $10,000;

22      (2) The Modified Asset Purchase Agreement must state that the bidder offers to purchase

23  all or some of the Assets upon the terms and conditions as set forth in the Buyer Agreement or

24  through an alternative structure on terms and conditions no less favorable to the Debtors than the

25  terms and conditions contained in the Buyer Agreement (as determined by the Debtor in their

26  reasonable business judgment);

27      (3) The Modified Asset Purchase Agreement must state that the bidder is financially

28  capable of consummating the transactions contemplated by the Modified Asset Purchase

1  Agreement;

2       (4) The Modified Asset Purchase Agreement must state that the Qualified Bidder's offer is

3  irrevocable until the Closing if such bidder is the Prevailing Bidder or if such bidder is the Back-

4  Up Bidder (as defined below) until such time as outlined below;

5       (5) The Modified Asset Purchase Agreement must identify with particularity each and

6  every executory contract and unexpired lease, the assumption and assignment or rejection of

7  which is a condition to closing;

8       (6) The Modified Asset Purchase Agreement must fully disclose the identity of each

9  entity that will be bidding for the Acquired Assets or otherwise participating in connection with

10  such bid, and the complete terms of any such participation;

11       (7) The Modified Asset Purchase Agreement must state that such bid does not contain any

12  due diligence or financing contingencies of any kind other than contained in the Agreement and

13  approval of the Sale by the Bankruptcy Court; and

14       (8) The Modified Asset Purchase Agreement must include evidence of authorization and

15  approval from the bidder's board of directors (or comparable governing body) with respect to the

16  submission, execution, delivery and closing of the Modified Asset Purchase Agreement.

17       **31.    The Debtor shall have the exclusive right to determine whether a bid is a**

18  **Qualifying Bid and shall notify bidders whether their bids have been recognized as such**

19  **prior to the Auction.**[12]

20       **In the event that the Debtor timely receives more than one Qualifying Bid, the Court**

21  **shall conduct the Auction with respect to the Assets at the hearing on the Motion.**

22       32.    The Sale of the Assets shall be on an "as is, where is" basis, without representations

23  or warranties of any kind, nature or description by the Debtor or Debtor's estate, except as may be

24  specifically set forth in the Agreement.

25       33.    The Prevailing Bid will be subject to approval by the Court at the hearing on the

26

27  _____
   [12] All rights granted in favor of Debtor in these Bidding Procedures shall be exercised in
   accordance with its fiduciary obligations.

28

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION**
**AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS –**
**TORTUGO BREWING COMPANY, LLC**

1  Motion.

2      34.    The transactions contemplated hereby shall be consummated (the **"Closing"**) on the

3  third business day after the Sale Order becomes a final order (the **"Closing Date"**) at a time and

4  place mutually agreed upon by Buyer and Seller. Notwithstanding anything to the contrary, Buyer

5  may waive the "finality" with respect to the Sale Order and may specify a Closing date for any

6  business day after entry of the Sale Order. If Closing does not occur as scheduled, Buyer and

7  Seller may mutually extend the Closing Date from time to time. Any cancellation or non-

8  extension of this Agreement by either party shall not prejudice any claims the canceling party may

9  have for breach or non-performance of this Agreement.

10      35.    If an Auction is conducted, the party with the next highest or otherwise best

11  Qualifying Bid at the Auction, as determined by the Debtors in the exercise of its business

12  judgment, shall be required to serve as a back-up bidder (the **"Back-Up Bidder"**).

13      36.    Following the Sale Approval Hearing, if the Prevailing Bidder fails to consummate

14  an approved sale because of a breach or failure to perform on the part of such Prevailing Bidder,

15  or provide the Final Qualification Packages, the Back-Up Bidder's bid will be deemed to be the

16  new Prevailing Bid, and the Debtor will be authorized, but not required, to consummate the sale

17  with the Back-Up Bidder without further order of the Court upon at least 24 hours' notice to the

18  Notice Parties (defined below). In such case, the Prevailing Bidder's Deposit and, if applicable, its

19  Additional Deposit, shall be dealt with in accordance with the terms of its Modified Asset

20  Purchase Agreement, and the Debtors specifically reserve the right to seek all available damages

21  from the defaulting Prevailing Bidder in accordance with the terms of that party's Asset Purchase

22  Agreement.

23      37.    In the event that the Debtor fails to consummate a transaction with the Back-Up

24  Bidder, the Back-Up Bidder's Deposit shall be dealt with in accordance with the terms of its Asset

25  Purchase Agreement and the Debtor specifically reserve the right to seek all available damages

26  from the defaulting Back-Up Bidder in accordance with the terms of its Asset Purchase

27  Agreement.

28      38.    In order to effectuate the Sale of the Acquired Assets, the Debtor must convey to

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS –
TORTUGO BREWING COMPANY, LLC**

1   the Buyer the Debtor's interest in the executory contracts and unexpired leases within the meaning

2   of Section 365 of the Bankruptcy Code including the obligations of U.S. Bank Equipment Finance

3   estimated to be approximately $89,176.56 plus accrued interest (the **"Assumed Contracts"**).

4   Accordingly, the Debtor seeks authority to assume and assign to Buyer certain Assumed

5   Contracts, subject to: (i) approval by the Bankruptcy Court; (ii) any other necessary approvals

6   (i.e., Assumed Contracts that cannot be assigned under applicable non-bankruptcy law absent the

7   other party's consent, and which restriction on assignment cannot be waived under the Bankruptcy

8   Code); (iii) payment by the Buyer of the costs required pursuant to sections 365(b)(1) (A) and

9   365(b)(1)(B) of the Bankruptcy Code (the **"Cure Costs"**) as determined by an order entered by the

10  Bankruptcy Court (which order shall not have been stayed or appealed) and paid no earlier than

11  thirty (30) days after the Close or such time as determined by the Court, or the agreement of the

12  Buyer and the counter-party to such Assumed Contract; and (iv) Buyers provision of sufficient

13  evidence of adequate assurance of future performance under the applicable Assumed Contract(s),

14  as required pursuant to sections 365(b)(1)(c) and 365(f)(2)(B) of the Bankruptcy Code. Attached

15  hereto and incorporated herein as Exhibit "B" is the Debtors proposed Cure Amounts and the

16  Assumed Contracts.

17      39.    The Sale Notice will list the Cure Costs, if any, that the Debtor believes to be owed

18  for each Assumed Contract as of the date the Sale Notice is mailed. Each counter-party to an

19  Assumed Contract will have up to the time provided under the Local Bankruptcy Rules for

20  objections to the Motion (the **"Objection Deadline"**) to object on any grounds, including the

21  amount of the Cure Costs, to the assumption and assignment of the Assumed Contract to which it

22  is a party. All counter-parties who do not file with the Court and serve on the counsel for the

23  Debtor, counsel for Buyer, and the Office of the United States Trustee, on or before the Objection

24  Deadline, an objection to the assumption and assignment of an Assumed Contract or the Cure

25  Costs will be deemed to have consented to the assumption and assignment of such Assumed

26  Contract and the Cure Costs set forth in the Sale Notice or supplemental notice.

27      40.    The facts of the instant case justify and substantiate the Debtor's business decision

28  that the contemplated sale of the Acquired Assets is in the best interest of the estate and should be

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS –
TORTUGO BREWING COMPANY, LLC**

1 | approved by this Court. The sales price was derived through arms-length negotiations and

2 | represents the fair market value for the Acquired Assets. Furthermore, in light of the current

3 | economic conditions, the Debtor believes that the offer is the best offer it will receive. By selling

4 | the Acquired Assets, the Debtor will best be able to reorganize its business.

5 |      41.     The Debtor believes that the offer is the highest and best offer it will receive,

6 | particularly in light of the problems facing its business. The terms of sale are greater than the

7 | value the Buyer contends they are worth. The Buyer, however, is willing to pay this price because

8 | of the unique opportunity to purchase the Acquired Assets. Thus, the Consideration is "fair and

9 | reasonable".

10 |      42.     In the instant case, the Buyer is not an insider within the meaning of

11 | Section 101(31), and the sale has been negotiated at arms-length. As set out in detail above, the

12 | Consideration is fair and reasonable. The Debtor believes that the Buyer's offer is the best offer

13 | he will receive. For these reasons, the sale meets the good faith requirement.

14 |      I declare under penalty of perjury pursuant to the laws of the United States of

15 | America that the foregoing is true and correct.

16 |      Executed on May 28, 2022 at Los Angeles, California.

17 |

18 |

19 |      Kevin O'Malley

20 |

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "*Agreement*") is entered into as of May ~1, 2022 (the "*Execution Date*") by and among **INDIE BREWING LLC**, a California limited liability company ("*Seller*"), Kevin O'Malley, an individual and member of Seller ("*O'Malley*"), Morgan Keller, an individual and member of Seller ("*Keller*", and together with O'Malley, the "*Members*") [**TORTUGO BREWING COMPANY, LLC**], a California limited liability company ("*Buyer*"), and Joseph Kovach, an individual and member of Buyer ("*Kovach*").

1.     Purchase of Assets.    Upon satisfaction of the Effective Conditions, subject to the terms and conditions of this Agreement, Seller hereby sells, assigns, transfers, conveys and delivers to Buyer (and Buyer hereby purchases), free and clear of any liens and security interests (other than liens securing the Equipment Loan (as defined below) all of Seller's right, title and interest in, to and under all of the equity listed on Schedule I attached hereto (collectively, the "*Acquired Assets*").

2.     Purchase Price.  In consideration for the sale and transfer of the Acquired Assets, Buyer hereby agrees (a) to pay to Seller, $7,200 in immediately available funds (the "*Purchase Price*"), and (b) assume all obligations owing by Seller in connection with the Equipment Loan (as defined below).

3.     Liabilities.    Buyer hereby assumes all debts, liabilities, obligations and responsibilities owing pursuant to Contract No. 550-0063813-000 entered into by Seller and U.S. Bank Equipment Finance (the "*Equipment Loan*") and agrees to make all payments with respect to such contract after the Effective Date.   Seller hereby represents and warrants that the amount of outstanding liabilities and obligations owing pursuant to the Equipment Loan as of the date hereof is approximately $89,176.56 plus accrued interest.

4.     Indemnification. Buyer and Kovach hereby acknowledge that each Member has personally guaranteed the obligations owing by Seller under the Equipment Loan. To facilitate the transactions set forth herein, each Member has agreed to remain as a personal guarantor on the Equipment Loan subsequent to the Closing Date. In consideration for the Members' agreement to remain personally liable on the Equipment Loan, Buyer and Kovach hereby indemnify, defend and hold harmless each Member for and from and against any and all claims, demands, liabilities, obligations, losses, damages, penalties, fines, actions, judgments, suits, costs, charges, expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel which may be imposed on, incurred by, or asserted against any Member arising out of or in any way relating to or as a consequence, direct or indirect, of Buyer's failure to satisfy its obligations owing on the Equipment Loan subsequent to the Closing Date.

5.     Further Assurances.  Seller shall deliver other bills of sale, endorsements, assignments, releases, and other good and sufficient instruments of transfer, assignment, and conveyance and assumption, in form satisfactory to Buyer and its counsel, as shall be effective to convey to Buyer good and merchantable title in and to the Acquired Assets.

6.    _Effectiveness._ This Asset Purchase Agreement shall become effective upon satisfaction of the following conditions precedent:

(a)    entry of an order of the United States Bankruptcy Court for the Central District of California, Los Angeles Division with respect to Seller's bankruptcy case approving the transactions contemplated by this Agreement subject to overbid, including without limitation the sale of the Acquired Assets free and clear of all liens and security interests, other than liens securing the Equipment Loan;

(b)    consent to the assumption of the Equipment Loan by U.S. Bank Equipment Finance by Buyer; and

(c)    payment of the Purchase Price to Buyer.

The date that all conditions precedent have been satisfied and the Acquired Assets are made available to Buyer to possess, shall be referred to as the *"**Closing Date**"*.

IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT, EXCEPT AS MAY BE OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, BUYER ACCEPTS THE CONDITION OF THE PURCHASED ASSETS "AS IS," "WHERE IS" AND "WITH ALL FAULTS" WITHOUT ANY IMPLIED REPRESENTATION, WARRANTY OR GUARANTEE AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE, OR AS TO THE CONDITION OF THE PURCHASED ASSETS, OR AS TO THE CONDITION, SIZE, EXTENT, QUANTITY, TYPE OR VALUE OF SUCH ASSETS, AND SELLER HEREBY EXPRESSLY DISCLAIMS ANY AND ALL SUCH IMPLIED REPRESENTATIONS, WARRANTIES OR GUARANTEES.

THIS AGREEMENT, INCLUDING THE VALIDITY HEREOF AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY IN SUCH STATE (WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PROVISIONS THEREOF).

[signatures to appear on following page]

WITNESS the due execution and delivery hereof on the date first above written.

**SELLER**:

INDIE BREWING LLC

By: _____

Name:  Kevin O'Malley

Title:  Manager

**BUYER**

TORTUGO BREWING COMPANY, LLC

By: Tortugo Brewing LLC

Name: Joseph Kovach

Title: manager

_____

Kevin O'Malley

_____

Morgan Keller

_____

Joseph Kovach

*(SIGNATURE PAGE to Bill of Sale)*

## SCHEDULE I

## ACQUIRED ASSETS

| Asset | Purchase Price |
|-------|----------------|
| Wild Goose Canning Line and all accessories thereto | Assumption of the Equipment Loan |
| 20 barrel brite tank | $5,000 |
| Forklift | $500 |
| Ingersoll Rand Air Compressor | $700 |
| Ingersoll Rand Air Dryer | $1,000 |

| In re: Indie Brewing, LLC | CHAPTER: 11 |
|---|---|
| Debtor(s). | CASE NUMBER: 2:22-bk-12633-ER |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 18500 W. Olympic Blvd., Suite 400, Los Angeles, CA 90064

A true and correct copy of the foregoing document described as **MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS OF THE DEBTORS BUSINESS ASSETS – TORTUGO BREWING COMPANY, LLC** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **May 29, 2022**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On **May 29, 2022** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed. *VIA U.S. MAIL*

☒ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| May 29, 2022 | Pamela Lynn | /s/Pamela Lynn |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

| | |
|---|---|
| In re: Indie Brewing, LLC <br><br> Debtor(s). | CHAPTER: 11 <br> CASE NUMBER: 2:22-bk-12633-ER |

**ADDITIONAL SERVICE INFORMATION (if needed):**

**I.  <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")</u>**

Michael S Kogan on behalf of Debtor
mkogan@koganlawfirm.com

United States Trustee (LA)
ustpregion16.la.ecf@usdoj.gov

Hatty K Yip on behalf of U.S. Trustee United States Trustee (LA)
hatty.yip@usdoj.gov, hatty.k.yip@usdoj.gov

Peter F Jazayeri on behalf of special counsel Indie Brewing, LLC
peter@jaz-law.com

**II. <u>SERVED BY U.S. MAIL OR OVERNIGHT MAIL</u>** - <u>VIA U.S. MAIL</u>

<u>Presiding Judge</u>
Honorable Ernest Robles
U.S. Bankruptcy Court
255 E. Temple St., #1560
Los Angeles, CA 90012