1  Michael S. Kogan (SBN 128500)
   **KOGAN LAW FIRM, APC**
2  11500 W. Olympic Blvd., Suite 400
   Los Angeles, California 90064
3  Telephone (310) 954-1690
   mkogan@koganlawfirm.com
4

5  Attorneys for Debtor

6             **UNITED STATES BANKRUPTCY COURT**

7             **CENTRAL DISTRICT OF CALIFORNIA**

8                **LOS ANGELES DIVISION**

9  **In re**                          ) Case No. 2:22-bk-12633-ER
                                       )
10 **INDIE BREWING, LLC,**            ) **Chapter 11**
                                       )
11        **Debtor.**                 ) **MOTION OF DEBTOR FOR SALE OF**
                                       ) **PROPERTY FREE AND CLEAR OF LIENS**
12                                     ) **OF THE DEBTORS BUSINESS ASSETS –**
                                       ) **TEN MILE BREWING, LLC;**
13                                     ) **MEMORANDUM OF POINTS AND**
                                       ) **AUTHORITIES AND DECLARATION OF**
14                                     ) **KEVIN O'MALLEY IN SUPPORT**
                                       ) **THEREOF**
15                                     )
                                       )
16                                     ) **Date:      July 20, 2022**
                                       ) **Time:      10:00 a.m.**
17                                     ) **Place:     Courtroom 1568**
                                       )
18                                     )
                                       )
19 _____ )

20        Indie Brewing, LLC, the debtor and debtor-in-possession herein (the "**Debtor**" or "**Seller**")

21 in this bankruptcy case, submits its Motion Of Debtor For Sale Of Property Free And Clear Of

22 Liens of the Debtors Business – Ten Mile Brewing, LLC (the "**Motion**").

23        The Debtor operated a craft brewery and tasting room (the "**Business**") in the Boyle

24 Heights section of Los Angeles from 2015 through 2022. It was the first craft brewery on the

25 eastside of LA since the 70s. Since opening, the Business has grown and attracted a devoted

26 following of local customers as well as people looking for a comfortable space to unwind near

27 downtown Los Angeles. It had over 200 accounts throughout Los Angeles and was served at

28 Dodger Stadium in 2021. The effects of the COVID Pandemic, coupled with the realization that

---

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS OF THE DEBTORS
BUSINESS ASSETS – TEN MILE BREWING, LLC    1**

1    there was nothing else to offer its landlord to obtain its consent resulted in the Debtor having no

2    alternative but to file this case. The Debtor has determined that a liquidation sale of its assets will

3    likely result in the greatest distribution to its creditors on their claims against the estate.

4    　　　Pursuant to the Motion, the Debtor seeks an order, pursuant to Section 363 of Title 11 of

5    the Bankruptcy Code (the "**Bankruptcy Code**"), approving the sale of certain of the Business

6    assets (the "**Acquired Assets**"), free and clear of all liens, claims and interests to Ten Mile

7    Brewing, LLC, or its assignee ("**Buyer**") pursuant to the Asset Purchase Agreement (the

8    "**Agreement**" or "**APA**")[1] entered into between the Buyer and the Debtor. The Buyer owns a

9    business similar to the Debtor's, which is well known both to the Debtor and other interested

10    parties. The Buyer's business is performing well financially, and the Debtor is satisfied that the

11    Buyer has the financial capacity to complete the sale and capital to operate and perform on the

12    obligations on the Acquired Assets, and consummate the transaction. The Debtor has received

13    financial information concerning the Buyers credit worthiness. The sale will be noticed to all

14    previous interested parties to the Acquired Assets, and to creditors and other interested parties.

15    The Debtor believes that all burdens of establishing a sound business justification for the sale of

16    the Acquired Assets have been met. The Debtor believes that the purchase price (the

17    "**Consideration**") maximizes the value of the Acquired Assets to the estate. The terms of the sale

18    with the Buyer have been negotiated at arms-length and the consideration for purchase of the

19    Acquired Assets is fair and reasonable, and represents the fair market value for the Acquired

20    Assets. Therefore, the Motion should be approved. If there are over bidders for the purchase of

21    the assets, the Debtor requests that the procedures outlined herein are approved.

22    　　　The Debtor believes that all burdens of establishing a sound business justification for the

23    sale of the Acquired Assets have been met:

24    　　1.　　　The Debtor believes that the purchase price (the "**Consideration**") maximizes the

25    　　　　　　value of the Acquired Assets to the estate.

26    　　2.　　　The terms of the sale with the Buyer have been negotiated at arms-length and the

27    _____

28    [1] Unless otherwise stated, defined terms are as set forth in the APA.

---

**MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS OF THE DEBTORS
BUSINESS ASSETS – TEN MILE BREWING, LLC    2**

1    consideration for purchase of the Acquired Assets is fair and reasonable, and

2    represents the fair market value for the Acquired Assets.

3    3.      Additionally, the Debtor has satisfied all procedural requisites of notice of the

4    Motion to obtain Court approval of this sale.

5    4.      The terms of the proposed sale are embodied in the Agreement, which is attached

6    as Exhibit "A" hereto and incorporated herein by this reference.

7    The Consideration is the best offer that the Debtor has received and expects to receive for

8    the Acquired Assets. **The Consideration is valued at $5,000 to the Debtor.** Furthermore, to

9    maximize the greatest value for this estate and its creditors, parties offering to purchase the

10   Acquired Assets, shall have the opportunity to overbid ("**Overbid**") for the purchase of the

11   Acquired Assets **at the time of the hearing on the Motion**, on substantially the same or better

12   terms as set forth in the Agreement. Any initial overbid for the Acquired Assets shall be in an

13   amount not less than six thousand dollars ($6,000) which is greater than the Buyers or such

14   amount that the Court sets, and the procedures for Over bidders are set forth more fully in the

15   Motion. Any and all additional Overbids will be subject to any further Overbid amount

16   requirements, set by the Court.

17   Any other parties interested in bidding on the Assets ("**Interested Bidders**") must submit

18   to counsel of the Seller, by no later than six (5) business days before the hearing set to approve the

19   Sale, cash or a money order or a cashier's check made payable to "Kogan Law Firm, AP{C Client

20   Trust Account" in the amount of six thousand dollars ($6,000), which amount shall be paid by any

21   successful Overbidder as a nonrefundable deposit and held by Sellers in a trust account pending

22   closing of the sale transaction; and at the time of the Sale, any Overbidder must demonstrate the

23   ability to pay the remaining portion of the purchase price ("**Remainder Amount**") and to

24   successfully consummate the sale transaction. Buyer shall have the right to participate in any

25   Overbid proceeding. A complete analysis of the overbid procedures is contained in the attached

26   Memorandum of Points and Authorities.

27   **THE FULL TERMS AND CONDITIONS OF THE SALE ARE INCLUDED IN THE**

28   **APA ATTACHED HERETO AS EXHIBIT "A", AND SHOULD BE CONSULTED BY**

1  **INTERESTED PARTIES**

2      **WHEREFORE,** based on this Motion, the annexed Memorandum of Points and

3  Authorities, the Declaration of Kevin O'Malley attached hereto, the arguments and statements of

4  counsel to be made at the hearing on the Motion, and other admissible evidence properly brought

5  before the Court, the Debtor respectfully requests that the Court authorize the sale of the Acquired

6  Assets pursuant to the terms of the Agreement and granting to the Debtor such other relief

7  necessary and appropriate.

8  DATED: June 24, 2022                **KOGAN LAW FIRM, APC**

9

10

11               By:  /s/ Michael S. Kogan
                 Michael S. Kogan

12                   Attorneys for Debtor

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Indie Brewing, LLC, the debtor and debtor-in-possession herein (the "**Debtor**" or "**Seller**")
in this bankruptcy case, submits its Motion Of Debtor For Sale Of Property Free And Clear Of
Liens of the Debtors Business – Ten Mile Brewing, LLC (the "**Motion**"). The Debtor operated a
craft brewery and tasting room (the "**Business**") in the Boyle Heights section of Los Angeles from
2015 through 2022. It was the first craft brewery on the eastside of LA since the 70s. Since
opening, the Business has grown and attracted a devoted following of local customers as well as
people looking for a comfortable space to unwind near downtown Los Angeles. It had over 200
accounts throughout Los Angeles and was served at Dodger Stadium in 2021. The effects of the
COVID Pandemic, coupled with the realization that there was nothing else to offer its landlord to
obtain its consent resulted in the Debtor having no alternative but to file this case. The Debtor has
determined that a liquidation sale of its assets will likely result in the greatest distribution to its
creditors on their claims against the estate. Pursuant to the Motion, the Debtor seeks an order,
pursuant to Section 363 of Title 11 of the Bankruptcy Code (the "**Bankruptcy Code**"), approving
the sale of certain of the Business assets (the "**Acquired Assets**"), free and clear of all liens,
claims and interests to Ten Mile Brewing, LLC, or its assignee (**"Buyer"**) pursuant to the Asset
Purchase Agreement (the "**Agreement**" or "**APA**")[2] entered into between the Buyer and the
Debtor. The Buyer owns a business similar to the Debtor's, which is well known both to the
Debtor and other interested parties. The Buyer's business is performing well financially, and the
Debtor is satisfied that the Buyer has the financial capacity to complete the sale and capital to
operate and perform on the obligations on the Acquired Assets, and consummate the transaction.
The Debtor has received financial information concerning the Buyers credit worthiness. The sale
will be noticed to all previous interested parties to the Acquired Assets, and to creditors and other
interested parties. The Debtor believes that all burdens of establishing a sound business

---

[2] Unless otherwise stated, defined terms are as set forth in the APA.

1    justification for the sale of the Acquired Assets have been met.  The Debtor believes that the

2    purchase price (the **"Consideration"**) maximizes the value of the Acquired Assets to the estate.

3    The terms of the sale with the Buyer have been negotiated at arms-length and the consideration for

4    purchase of the Acquired Assets is fair and reasonable, and represents the fair market value for the

5    Acquired Assets.  Therefore, the Motion should be approved. If there are over bidders for the

6    purchase of the assets, the Debtor requests that the procedures outlined herein are approved.

7    <center>II.</center>

8    <center>**FACTUAL BACKGROUND**</center>

9    A.    <u>**Background of the Debtor.**</u>

10    On or about May 9, 2022, the Debtor commenced this case by filing a Voluntary Petition

11    under Chapter 11, Title 11, United States Code (the **"Petition Date"**). The Debtor is operating its

12    business and managing its financial affairs as a debtor in possession pursuant to Sections 1107 and

13    1108 of the Bankruptcy Code.

14    The Debtor operated a craft brewery and tasting room (the **"Business"**) in the Boyle

15    Heights section of Los Angeles from 2015 through 2022.  It was the first craft brewery on the

16    eastside of LA since the 70s.  Since opening, the Business has grown and attracted a devoted

17    following of local customers as well as people looking for a comfortable space to unwind near

18    downtown Los Angeles.  It had over 200 accounts throughout Los Angeles and was served at

19    Dodger Stadium in 2021.  The Debtor encouraged many local food vendors and merchants to do

20    their first "pop up" at the Business and as a result, several small businesses launched from the

21    welcoming atmosphere created by the Debtor.

22    The Debtor has been profitable in the past, and is very well regarded, however, a number

23    of events impacted its ability to continue profitable operations. **First**, due to the COVID Pandemic

24    its Business was severely impacted. In March 2020, all of the City of Los Angeles went dark. The

25    COVID Pandemic, unprecedented in scope and destruction, spawned a massive and severe

26    government response that completely shuttered the Debtors operations and in fact prohibited

27    similar operations in the City of Los Angeles.  From March 2020 through June 2020 the Debtor's

28

tasting room (which accounted for 65% of its revenue in 2019) was shut down other than selling beer to go.   In June 2020, it appeared that the City of Los Angeles would once again be opened up for activities such as the brewery operation, unfortunately, the COVID-19 Pandemic shortly took a turn for worse, and on July 1, 2020, the State of California and then the City of Los Angeles, issued temporary closure of indoor restaurant and brewery operations, including the Debtor. From March 2020 through March 2021 the Debtor's tasting room was only open for a handful of weeks (with strict regulation) and once permitted to open in March 2021, the Debtor was only able to operate outdoors and at 50% of capacity.   Thus, from March 2020 through the February 2022 (the "**Pandemic Period**") the Debtor was either closed or required to operate at only 50% capacity.  Against this backdrop, the Debtor struggled to survive.

**Second**, prior to and throughout the COVID Pandemic and presently the Debtor has had a number of disputes with its landlord, 2301 East 7th Street, LLC (the "**Landlord**"). On or about June 30, 2014, Landlord and the Debtor entered into a written lease for the premises located at 2301 East 7th Street, #100C (the "**Lease**") in which the Business operated.  On or about January 8, 2020, the Landlord and the Debtor entered into an amendment to the Lease (the "**First Lease Amendment**"), which increased the term of the Lease for six years, commencing February 19, 2020 and ending February 18, 2025 (the "**Term**").  The First Lease Amendment provided for monthly base rent in the amount of the $13,800 plus a proportionate amount for various property expenses (the "**Rent**").

During March 2020, Los Angeles County issued an Executive Order that imposed a temporary moratorium on evictions for non-payment of rent by residential or commercial tenants impacted by the COVID Pandemic (the "**Moratorium**").  The Moratorium has been extended through December 2022. Pursuant to the Moratorium which the Debtor took advantage of, commercial tenants, such as the Debtor with less than 9 employees have until January 31, 2023 to repay any past due rent that accrued from March 2020 to January 2022.  Notwithstanding the Moratorium and the relief from Rent it provided, the Debtor, in good faith, paid Rent to Landlord during the Pandemic Period in an amount equal to approximately $168,000 (or one year's Rent).

In September 2020, given the impact of the COVID Pandemic on its operations, and the horrid business conditions that persisted, the Debtor began actively marketing its Business and related assets in hopes of entering into a sale to allow it to extricate itself from its mounting liabilities and to satisfy its creditors.

By October 2020, the Debtor entered into negotiations with Alan Newman of Alchemy & Science in Burlington, Vermont, as a prospective buyer for the Business (the "**First Buyer**"). The First Buyer and Debtor delivered a letter of intent to the Landlord however the sale to the First Buyer never occurred due to resistance of the Landlord to entertain any modifications to the Lease despite the realities of the COVID Pandemic and its impact on the Debtor's Business. From November 2020 through January 2021, the Debtor contacted the Landlord on multiple occasions to discuss additional potential buyers and sales. These contacts were either not responded to, or the Debtor was otherwise instructed that the Landlord refused to consent to any sale or modifications to the Lease.

In March 2021, the Landlord, in violation of the Moratorium, sued the Debtor and its members for failure to pay rent during the Pandemic. The lawsuit resulted in even further economic duress of the Debtor and its members at a time when it was losing a significant amount of money and barely operating.

On December 2, 2021, the Debtor, after a for sale process that produced three term sheets from three different potential buyers, signed a term sheet with a successful and existing brewery, Los Angeles Ale Works, LLC (the "**Second Buyer**"). The Second Buyer operated a brewery and tasting room in Hawthorne for six years, was in the process of opening another location in Culver City which has now opened, and was interested in the Business because it provided a turn-key opportunity for expansion in the downtown area. The Debtor and the Second Buyer entered into a term sheet pursuant to which the Second Buyer would acquire the Business (the "**Sale**"). The proceeds of the Sale would have paid the Landlord in full as well as all the Debtors creditors (including the Small Business Administration, the IRS and other governmental entities) while the members and equity holders of the Debtor were not to receive any proceeds. The Sale was being

conducted completely for the benefit of the creditors and the Landlord was receiving almost 50% of the Sale proceeds.

On December 2, 2021, the Debtor provided a copy of the executed term sheet to the Landlord.  It requested a copy of the Lease cure amount and an assignment.  From approximately December 2 to December 13, 2021, the Debtor continued to inform the Landlord that it was losing cash, and that it needed to know the Landlord's position, as it did not want to lose the Second Buyer.

On December 13, 2021, the Landlord informed the Debtor that it would not consider a Lease assignment or modification until the Lease defaults were cured.  The next day, the Debtor again informed the Landlord that it did not have sufficient cash to cure the default and the only way that it could cure the Lease defaults was through the Sale.  The Debtor explained that it had found an excellent and well-qualified buyer for the Business, any Lease defaults would be cured in full upon closing of the Sale via an escrow payment, and that all the Landlord needed was to consent to an assignment which would cure every default and provide the Landlord with full payment.  Absent this, the Debtor explained that it would have no choice but to seek bankruptcy protection.

On February 28, 2022, due to the devastating effects of the COVID Pandemic, the Debtor ceased operating the Business to the public, except for a very small and limited distribution of beer cans sold through online media.

On March 29, 2022, the Debtor informed the Landlord that the Sale between the Second Buyer and the Debtor was in the final stages of lender approval, and that it expected to close on approximately April 15, 2022, at which point the amount necessary to cure all Lease defaults and pay the Landlord's legal fees would be placed into escrow and the assignment would be sent to the Landlord.

On April 14, 2022, the Debtor provided the Landlord with an executed purchase agreement (the "**APA**") with the Second Buyer for the Sale, along with a draft assignment that provided for: (a) repayment in full of all amounts owing to the Landlord (including all of its legal fees for its

---

lawsuit against the Debtor and its managing members), (b) resolution and release of all outstanding claims, (c) a new tenant for the remainder of the term of the lease, and (d) all existing personal guarantees to remain in place. The Debtor explained that the Sale was expected to close on April 25, 2022, and that the Second Buyer was an established brewery that operated for several years in Los Angeles, and that the COVID Pandemic had forced the Debtor to close. The Debtor further stated that if the Sale did not close, it would have no choice but to file for bankruptcy. The Landlord then thwarted the Sale by refusing to consent to an assignment that would have provided it with full repayment and a new tenant. On April 28, 2022, the Second Buyer informed the Debtor that it was no longer interested in buying the Business and terminated the APA and the Sale because it could not comprehend why the Landlord would reject an assignment that paid it in full and gave it a new tenant for the remainder of the Lease with no effort, cost or assistance from the Landlord.

**B.**    **The Bankruptcy Case and Efforts to Sell the Business.**

The effects of the COVID Pandemic, coupled with the realization that there was nothing else to offer the Landlord to obtain its consent resulted in the Debtor having no alternative but to file this case. Without the Sale proceeds, the Debtor has no ability to pay its creditors other than a liquidation sale which would result in likely less than the proceeds of the Sale. As a result, the Debtor commenced its Chapter 11 bankruptcy case. The Debtor believes that through liquidation of its assets and its claims against the Landlord, it will be able to make a significant distribution to its creditors on their claims.

As set forth above, the Debtor has been attempting to sell its assets for a number of years. In fact, the Debtor had a number of purchase agreements to purchase all of its assets, however in each instance the sales required the assignment of the lease which was withheld by the Landlord. Consequently, the Debtor does not believe it can sell all of its assets to a purchaser who would operate in its present location. Therefore, the Debtor has marketed individual or groups of its assets to many potential purchasers to obtain the best and highest value for those assets.

The Debtor's principals have been in the brewery business in Los Angeles for a significant

1   period and are very familiar with virtually every player in the field. Consequently, the principals

2   reached out through the industry, and contacted the LA Brewers Guild ("**Brewers Guild**") email

3   list with over 88 local breweries included and has daily emails and threads relevant to the local

4   guild members) with the attached equipment spreadsheet (which includes the equipment included

5   in the sales agreement).  Have informed the Brewers Guild the Debtor will be having an open

6   house Wednesday May 25th from 10-3pm where breweries can come view the equipment and

7   make a bid (including equipment subject to the agreement). Further the Debtor has received six

8   (16) emails of interest so far with the majority saying they will attend the open house on May 25th

9   to view the Acquired Assets. The principals also generally have made it known throughout the

10   industry that they would be agreeable to a sale, and believe they have reached any and all potential

11   purchasers regarding the sale of the Acquired Assets.

12         **The Debtor has determined that the best way to maximize value for its creditors and**

13   **the estate is to sell the Acquired Assets to Buyer.**  The Debtor conducted an extensive marketing

14   effort for the Acquired Assets. Therefore, the Seller desires to sell, and Buyer desires to purchase,

15   subject to the terms and conditions hereof and in accordance with Section 363 of the Bankruptcy

16   Code, the Acquired Assets as described in the APA.

17         The proposed Sale of the Assets pursuant to the procedures on the timeline proposed

18   herein represents the best opportunity to maximize the value of the Debtor's estate for all

19   interested parties.  **The Debtor's ability to consummate the proposed Sale as soon as possible**

20   **is essential to maximizing the value of the estate going forward. The Sale gives creditors of**

21   **the estate the certainty of payment in a very short time.**

22         **The full terms of the Sale are set forth in the Agreement attached hereto and**

23   **incorporated herein by this reference as Exhibit "A".  A summary of the relevant terms are**

24   **as follows[3]:**

25   C.    <u>**Terms of the Sale.**</u>

26         The terms of the Sale can be summarized as follows:

27   _____

     [3] The Agreement should be consulted for all terms of the Sale.

28

1

2

3

<u>Purchase of Assets</u>.    Upon satisfaction of the Effective Conditions, subject to the terms and conditions of this Agreement, Seller hereby sells, assigns, transfers, conveys and delivers to Buyer (and Buyer hereby purchases), free and clear of any liens and security interests all of Seller's right, title and interest in, to and under all of the equipment listed on <u>Schedule I</u> attached hereto (collectively, the "***Acquired Assets***").

4

5

<u>Purchase Price</u>.    In consideration for the sale and transfer of the Acquired Assets, Buyer hereby agrees (a) to pay to Seller, $5,000 in immediately available funds (the "***Purchase Price***").

6

7

8

9

<u>Liabilities</u>.    Buyer does not assume and shall in no event be liable for any debts, liabilities, obligations or responsibilities of any kind whatsoever of Seller and/or relating to the Acquired Assets, whether direct, indirect, recorded, unrecorded, accrued, absolute, contingent or otherwise, known or unknown, whether due or to become due, all of which shall remain the sole obligations of Seller.

10

11

<u>Further Assurances</u>.    Seller shall deliver other bills of sale, endorsements, assignments, releases, and other good and sufficient instruments of transfer, assignment, and conveyance and assumption, in form satisfactory to Buyer and its counsel, as shall be effective to convey to Buyer good and merchantable title in and to the Acquired Assets.

12

13

<u>Effectiveness</u>.    This Asset Purchase Agreement shall become effective upon satisfaction of the following conditions precedent:

14

15

16

(a)    entry of an order of the United States Bankruptcy Court for the Central District of California, Los Angeles Division with respect to Seller's bankruptcy case approving the transactions contemplated by this Agreement subject to overbid, including without limitation the sale of the Acquired Assets free and clear of all liens and security interests; and

17

(b)    payment of the Purchase Price to Buyer.

18

19

The date that all conditions precedent have been satisfied and the Acquired Assets are made available to Buyer to possess, shall be referred to as the "***Closing Date***".

20

21

**THE FULL TERMS AND CONDITIONS OF THE SALE ARE INCLUDED IN THE APA ATTACHED HERETO AS EXHIBIT "A", AND SHOULD BE CONSULTED BY INTERESTED PARTIES**

22

23

24

25

The proposed Sale of the Acquired Assets pursuant to the procedures on the timeline proposed herein represents the best opportunity to maximize the value of the Debtor's estate for all interested parties.  The Debtor's ability to consummate the proposed Sale as soon as possible is essential to maximizing the value of the estate going forward.

26

27

28

**As mentioned above, all of the Debtor' right, title and interest in all of the Acquired Assets shall be sold free and clear of any liens, security interests, claims, charges or encumbrances in accordance with §363 of the Bankruptcy Code.  The Debtor proposes that**

1   any such liens, security interests, claims, charges or encumbrances, shall attach to the

2   amounts payable to the Debtor resulting from the Sale (the "Sale Proceeds"), and held by

3   the Debtor, in the same order of priority and subject to the rights, claims, defenses, and

4   objections, if any, of all parties with respect thereto, subject to any further order of the

5   Court.[4]

6   D.      **Overbid and Sale/Auction Procedures.**

7          The Debtor has and continues to solicit offers and has coordinated the process of informing

8   potential bidders and evaluating those offers received on the Debtor's behalf. In order to maximize

9   the greatest value for this estate and its creditors, **at the time of the hearing on approval of the**

10  **Sale,** parties offering to purchase the Acquired Assets shall have the opportunity to overbid the

11  purchase of the Acquired Assets on substantially the same or better terms as those set forth in the

12  Agreement.

13         The initial overbid will be six thousand dollars ($6,000) cash, which is over the offer of the

14  Buyer or other amount set by the Bankruptcy Court (*"Overbid"*), and the other obligations that

15  Buyer has agreed to under the Agreement. In addition: (a) all third party bids must be in form and

16  substance substantially and materially similar to the bid submitted pursuant to the Agreement; (b)

17  any third party making an Overbid (*"**Overbidder**"*) must submit to counsel of the Seller, by no

18  later than six (5) business days before the hearing set to approve the Sale, cash or a money order or

19  a cashier's check made payable to "Kogan Law Firm, APC Client Trust Account" in the amount

20  of six thousand dollars ($6,000), which amount shall be paid by any successful Overbidder as a

21  nonrefundable deposit and held by Seller in a trust account pending closing of the sale transaction;

22  and (c) at the time of the Sale, any Overbidder must demonstrate the ability to pay the remaining

23  portion of the purchase price (*"**Remainder Amount**"*) and to successfully consummate the sale

24  transaction.  Buyer shall have the right to participate in any Overbid proceeding.

25  _____

26         [4] The Debtor believes it has 2 secured creditors who may assert a lien on the Acquired
    Assets. U.S. Bank has a 1st lien on all of the assets of the Debtor and is owed approximately
    $59,170, and the Small Business Administration has a 2nd Lien on all assets of the Debtor and is

27  owed approximately $150,000. The Debtor has conducted a recent UCC search setting forth all
    liens against the Debtor. No other liens were found that assert an interest in the Acquired Assets.

28

Furthermore, in order for each Qualified Bidder to present a "Qualifying Bid," the following must occur:

(1) The Qualifying Bidder must submit a asset purchase agreement along with its deposit ("**Modified Asset Purchase Agreement**") which must contain a purchase price in an amount at least equal to the sum of the Purchase Price in the Buyer Agreement and be at least in the amount of $6,000;

(2) The Modified Asset Purchase Agreement must state that the bidder offers to purchase all or some of the Assets upon the terms and conditions as set forth in the Buyer Agreement or through an alternative structure on terms and conditions no less favorable to the Debtors than the terms and conditions contained in the Buyer Agreement (as determined by the Debtor in their reasonable business judgment);

(3) The Modified Asset Purchase Agreement must state that the bidder is financially capable of consummating the transactions contemplated by the Modified Asset Purchase Agreement;

(4) The Modified Asset Purchase Agreement must state that the Qualified Bidder's offer is irrevocable until the Closing if such bidder is the Prevailing Bidder or if such bidder is the Back-Up Bidder (as defined below) until such time as outlined below;

(5) The Modified Asset Purchase Agreement must fully disclose the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(6) The Modified Asset Purchase Agreement must state that such bid does not contain any due diligence or financing contingencies of any kind other than contained in the Agreement and approval of the Sale by the Bankruptcy Court; and

(7) The Modified Asset Purchase Agreement must include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Asset Purchase Agreement.

**The Debtor shall have the exclusive right to determine whether a bid is a Qualifying Bid and shall notify bidders whether their bids have been recognized as such prior to the**

1  Auction.[5]

2      **In the event that the Debtor timely receives more than one Qualifying Bid, the Court**

3  **shall conduct the Auction with respect to the Assets at the hearing on the Motion**.

4  **D.    As Is, Where Is.**

5      The Sale of the Assets shall be on an "as is, where is" basis, without representations or

6  warranties of any kind, nature or description by the Debtor or Debtor's estate, except as may be

7  specifically set forth in the Agreement.

8  **F.    Sale Approval Hearing.**

9      The Prevailing Bid will be subject to approval by the Court at the hearing on the Motion.

10  **G.    Closing Conditions and Deadlines.**

11      The transactions contemplated hereby shall be consummated (the "**Closing**") on the third

12  business day after the Sale Order becomes a final order (the "**Closing Date**") at a time and place

13  mutually agreed upon by Buyer and Seller.  Notwithstanding anything to the contrary, Buyer may

14  waive the "finality" with respect to the Sale Order and may specify a Closing date for any business

15  day after entry of the Sale Order.  If Closing does not occur as scheduled, Buyer and Seller may

16  mutually extend the Closing Date from time to time.  Any cancellation or non-extension of this

17  Agreement by either party shall not prejudice any claims the canceling party may have for breach

18  or non-performance of this Agreement.

19  **H.    Failure to Consummate Purchase.**

20      If an Auction is conducted, the party with the next highest or otherwise best Qualifying

21  Bid at the Auction, as determined by the Debtors in the exercise of its business judgment, shall be

22  required to serve as a back-up bidder (the "**Back-Up Bidder**").

23      Following the Sale Approval Hearing, if the Prevailing Bidder fails to consummate an

24  approved sale because of a breach or failure to perform on the part of such Prevailing Bidder, or

25  provide the Final Qualification Packages, the Back-Up Bidder's bid will be deemed to be the new

26  _____

27      [5] All rights granted in favor of Debtor in these Bidding Procedures shall be exercised in accordance with its fiduciary obligations.

28

1  Prevailing Bid, and the Debtor will be authorized, but not required, to consummate the sale with

2  the Back-Up Bidder without further order of the Court upon at least 24 hours' notice to the Notice

3  Parties (defined below).  In such case, the Prevailing Bidder's Deposit and, if applicable, its

4  Additional Deposit, shall be dealt with in accordance with the terms of its Modified Asset

5  Purchase Agreement, and the Debtors specifically reserve the right to seek all available damages

6  from the defaulting Prevailing Bidder in accordance with the terms of that party's Asset Purchase

7  Agreement.

8         In the event that the Debtor fails to consummate a transaction with the Back-Up Bidder,

9  the Back-Up Bidder's Deposit shall be dealt with in accordance with the terms of its Asset

10  Purchase Agreement and the Debtor specifically reserve the right to seek all available damages

11  from the defaulting Back-Up Bidder in accordance with the terms of its Asset Purchase

12  Agreement.

13

14                                   **III.**

15  **THE COURT SHOULD ALLOW THE SALE OF THE ACQUIRED ASSETS TO THE**

16                                  **BUYER**

17         Section 363(b)(1) permits a trustee, or a debtor in possession, after notice and a hearing, to

18  "sell ..., other than in the ordinary course of business, property of the estate."  11 U.S.C.

19  § 363(b)(1).  The standards for approval of a sale pursuant to Section 363(b)(1) require the

20  proponent of the sale to establish that:

21         (1)    a "sound business purpose justifies the sale;"

22         (2)    "accurate and reasonable notice" of the sale was provided;
        (3)    "the price to be paid is adequate, i.e., fair and reasonable;" and

23         (4)    "'good faith,' i.e., the absence of any lucrative deals with insiders, is present."  In
    re Industrial Valley Refrig. And Air Cond. Supplies, Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987).

24

25         As discussed below, the estate believes that all of the above requirements have been met.

26  Therefore, the Court should grant the Motion and permit the Debtor to sell the Acquired Assets to

27  the Buyer pursuant to the terms of the Agreement.

28  A.    **Sound Business Justification**

1    The Ninth Circuit Bankruptcy Appellate Panel in In re Walter, 83 B.R. 14 (9th Cir. BAP

2    1988), adopted a flexible, case by case test to determine whether the business purpose for the

3    proposed sale justifies disposition of property of the estate under Section 363(b). In Walter, the

4    court adopted the reasoning of the Fifth Circuit in In re Continental Air Lines, Inc., 780 F.2d 1223

5    (5th Cir. 1986), and the Second Circuit in In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983), and

6    articulated the criteria a bankruptcy court is to consider in deciding whether to approve or

7    disapprove the use or sale of estate property under Section 363(b):

8    
9    
10   
> Whether the proffered business justification is sufficient depends on
> the case. As the Second Circuit held in Lionel, the bankruptcy judge
> should consider all salient factors pertaining to the proceeding and,
> accordingly, act to further the diverse interests of the Debtor,
> creditors and equity holders, alike. He might for example, look to
> such relevant facts as the proportionate value of the asset to the
> estate as a whole, the amount of elapsed time since the filing, the
> likelihood that a plan of reorganization will be proposed and
> confirmed in the near future, the effect of the proposed disposition
> on future plans of reorganization, the proceeds to be obtained from
> the disposition vis-à-vis any appraisals of the property, which of the
> alternatives of use, sale or lease the proposal environs and, most
> importantly perhaps, whether the asset is increasing or decreasing in
> value. This list is not intended to be exclusive, but merely to
> provide guidance to the bankruptcy judge.

11   
12   
13   
14   
15   
16   

17   Walter, 83 B.R. at 19-20, quoting Continental Air Lines, Inc., 780 F.2d at 1226, citing Lionel, 722

18   F.2d at 1071.

19   The facts of the instant case justify and substantiate the Debtor's business decision that the

20   contemplated sale of the Acquired Assets is in the best interest of the estate and should be

21   approved by this Court. The sales price was derived through arms-length negotiations and

22   represents the fair market value for the Acquired Assets. The Debtor has attempted many different

23   business solutions both prior to and after the filing of the Bankruptcy Case, however, the Sale has

24   become the Debtors best alternative to maximize value for creditors. The Debtor cannot operate

25   as a going concern without the infusion of additional working capital. The Debtor is unable to

26   obtain lines of credit or any other form of traditional bank or institutional financing to fund its

27   working capital needs.

28   The Business is composed of certain assets that are currently owned, leased or licensed by

1    Seller. The core of the solution was at first a sale of all of the Debtors assets and an assignment of

2    the Lease. Subsequent to the filing of the Bankruptcy Case, the Debtor determined that the best

3    way to maximize value for its creditors and the estate was to conduct an extensive marketing effort

4    for the Acquired Assets. Since that time, the Debtor has arranged to sell the Acquired Assets to

5    Buyer. Therefore, Seller desires to sell, and Buyer desires to purchase, subject to the terms and

6    conditions hereof and in accordance with Section 363 of the Bankruptcy Code, certain of the

7    assets of Seller as described herein.

8        The proposed Sale of the Acquired Assets pursuant to the procedures on the timeline

9    proposed herein represents the best opportunity to maximize the value of the Debtor's estate for all

10   interested parties. **The Debtor's ability to consummate the proposed Sale as soon as possible**

11   **is essential to maximizing the value of the estate going forward, and without approval on an**

12   **expatiated basis, the Debtor's alternative would be far worse for creditors of the estate. The**

13   **Sale gives creditors of the estate the certainty of payment in a very short time.** The foregoing

14   demonstrates that the sale of the Acquired Assets is justified by sound business purposes,

15   satisfying the first requirement for a sale under 11 U.S.C. § 363(b).

16   B.    <u>Fair and Reasonable Price</u>

17       For the purposes of Section 363(b), the requirement that a fair and reasonable price be

18   obtained for the property has been defined as requiring a price equaling at least 75% of the fair

19   market value of the property — absent extenuating circumstances. See, e.g., In re Abbotts Dairies

20   of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); Willemain v. Kivitz, 764 F.2d 1019 (4th Cir.

21   1985); In re Karpe, 84 B.R. 926 (Bankr. M.D. Pa. 1988). The Debtor believes that the offer is the

22   highest and best offer he will receive, particularly in light of the problems facing the vehicle

23   industry today. The terms of sale are greater than the value the Buyer contends they are worth.

24   The Buyer, however, is willing to pay this price because of the unique opportunity to obtain and

25   use the Acquired Assets. Thus, the Consideration is "fair and reasonable".

26       Furthermore, the Debtor is proposing to seek approval for the Sale subject to overbid. The

27   overbid process will enable the Debtor to solicit and consider any offer for the Acquired Assets

28   that includes a purchase price in excess of the Purchase Price under the APA. Thus, the Debtor

1  believes that it has negotiated the best available terms for the purchase of the Acquired Assets

2  pursuant to the APA, and that the purchase price that the Debtor will obtain for the Acquired

3  Assets pursuant to the Sale Procedures will be the highest and best value that the Debtor could

4  obtain.

5  **IV.**

6  **THE ACQUIRED ASSETS CAN BE SOLD FREE AND CLEAR OF LIENS**

7       Under Section 363(f), a trustee or debtor in possession may sell property out of the

8  ordinary course of business "free and clear of any interest in such property of an entity other than

9  the estate if any one of the six conditions is met"

10       This section of the Bankruptcy Code has been interpreted to be disjunctive, rather than the

11  conjunctive. Thus, the Debtor need only demonstrate that one of the above conditions exists. In

12  re Elliot, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988). As discussed below, the facts and

13  circumstances of this case support the conclusion that the Acquired Assets can be sold free and

14  clear of any liens, claims, or interests pursuant to Section 363(f).

15  A.    **Section 362(f)(2)**

16       The Acquired Assets may be sold free and clear of the liens against it because the entities

17  with interests in the Acquired Assets, other than the bankruptcy estate, consent or will be paid by

18  Buyer. The Debtor has notified all interested parties of the sale through the Notice of Motion. If

19  there is no objection, the parties will be deemed to have consented to the sale of the Acquired

20  Assets. See Veltman v. Whetzal, 93 F.3d 517 (8th Cir. 1996) (failure to object to proposed sale,

21  coupled with agreement authorizing sale free of interest, constituted consent); Citicorp

22  Homeowners Services, Inc. v. Elliot, 94 B.R. 343 (E.D. Pa. 1988) (implied consent found);

23  Hargrave v. Pemberton, 175 B.R. 855 (Bankr. D. N.J. 1994) (failure to object to notice of sale or

24  attend hearing deemed consent to sale for purposes of Section 363); In re Shary, 152 B.R. 724

25  (Bankr. N.D. Ohio 1993) (state's failure to object to transfer of liquor license constituted consent

26  to sale). Moreover, the Debtor proposes that any such liens, security interests, claims, charges or

27  encumbrances, shall attach to the amounts payable to the Debtor resulting from the Sale be held by

28  the Debtor, in the same order of priority and subject to the rights, claims, defenses, and objections,

1  if any, of all parties with respect thereto, subject to any further order of the Court. Thus, pursuant

2  to Section 363(f)(2), the Debtor may sell the Acquired Assets of the estate free and clear of any

3  interest of entities other than the bankruptcy estate because they will be deemed to have consented

4  to the sale of the Acquired Assets if they make no objections to the sale.[6] No objections by secured

5  creditors are anticipated.

6  **B.**    **Section 363(f)(3)**

7          Under Section 363(f)(3), the Debtor may sell property, pursuant to Section 363(b), free and

8  clear of any interest in that property provided that such interest is a lien, and the price at which

9  such property is to by sold is greater than the aggregate value of all liens on such property.  This

10 provision requires the court to look not merely to the value of the lien of the objecting creditor, but

11 to whether the estate has any equity in the property.  Collier on Bankruptcy § 363.06[4].  Thus, the

12 Sale can be authorized since it has been shown that the Acquired Assets are being sold at fair

13 market value, and proceeds will be paid to the lien holders according to their respective interests

14 up to the value of the Acquired Assets or such obligations will be paid by Buyer. Moreover, the

15 Debtor proposes that any such liens, security interests, claims, charges or encumbrances, shall

16 attach to the amounts payable to the Debtor resulting from the Sale be held by the Debtor, in the

17 same order of priority and subject to the rights, claims, defenses, and objections, if any, of all

18 parties with respect thereto, subject to any further order of the Court.

19 **C.**    **Section 363(m) – Good Faith**

20         The Court should hold that the Buyer is a good faith purchaser entitled to the protections

21 afforded a purchaser pursuant to Section 363(m).

22         Section 363(m) provides:

23         The reversal or modification on appeal of an authorization under subsection (b) or
            (c) of this section of a sale or lease of property does not affect the validity of a sale
24         or lease under such authorization to an entity that purchased or leased such property

---

25    [6] The Debtor believes it has 2 secured creditors who may assert a lien on the Acquired
26  Assets. U.S. Bank has a 1st lien on all of the assets of the Debtor and is owed approximately
    $59,170, and the Small Business Administration has a 2nd Lien on all assets of the Debtor and is
27  owed approximately $150,000. The Debtor has conducted a recent UCC search setting forth all
    liens against the Debtor. No other liens were found that assert an interest in the Acquired Assets.

28

---

1 | in good faith, whether or not such entity knew of the pendency of the appeal, unless
such authorization and such sale or lease were stayed pending appeal.

2 | 11 U.S.C. § 363(m).

3 | Pursuant to Section 363(m), a good faith purchaser is one who buys in good faith and for

4 | value. Lack of good faith is shown by fraud, collusion between the purchaser and the trustee, or

5 | an attempt to take grossly unfair advantage of other bidders. In re Ewell, 958 F.2d 276, 279 (9th

6 | Cir. 1992). The Buyer has paid the fair market value for the Acquired Assets and acted in good

7 | faith. Moreover, the Buyer has no connections to the Debtor. Therefore, the Court should find that

8 | the Buyer is a good faith purchaser pursuant to Section 363(m). For all of the reasons set forth

9 | above, the Debtor believes that the sale of the Acquired Assets free and clear of liens, claims or

10 | interests is proper pursuant to Section 363(f).

**V.**

**WAIVER OF STAY PURSUANT TO FRBP 6004(h) and 6006(d)**

Federal Rules of Bankruptcy Procedure ("FRBP") 6004(h) and 6006(d) provide that, unless

the Court orders otherwise, an order authorizing the Sale will be stayed for six (14) days after

entry. Here, the Debtor requests that the Court waive the stay pursuant to FRBP 6004(h) and

6006(d). The Sale is premised on a prompt closing, particularly in light of the Debtor's liquidity

concerns. This key timing component to the transaction means that the parties cannot afford to

wait the automatic six (14) days contemplated by FRBP 6004(h) and 6006(d).

**VI.**

**CONCLUSION**

For the foregoing reasons, the Debtor respectfully requests that the Motion be granted in

all respects, and for such other and further relief as the Court deems just and proper.

DATED: June 24, 2022                **KOGAN LAW FIRM, APC**
                                    Michael S. Kogan


                                    By:  /s/ Michael S. Kogan
                                        Michael S. Kogan, Attorneys for Debtor
**DECLARATION OF KEVIN O'MALLEY**

I, Kevin O'Malley, do hereby declare:

1.      I make this declaration in support of the Motion of Debtor for Sale of Property Free and Clear of Liens of the Debtors Business – Ten Mile Brewing, LLC (the "**Motion**") in the bankruptcy case of Indie Brewing, LLC (the "**Debtor**" or "**Seller**"), the debtor and debtor in possession herein. I have personal knowledge of the facts set forth herein, if called as a witness, I could and would competently testify under oath to these facts set forth herein. If any facts are based upon information and belief, I so state.

2.      I am the Manager of the Debtor, the debtor and debtor in possession herein. In my capacity as the Manager of the Debtor, I am readily familiar with the Debtor's day-to-day operations, business affairs and books and records. I have personal knowledge of how the Debtor's records are compiled. The records of the Debtor are made in the ordinary course of the Debtor's business at or near the time of which they are a record, by such person or persons who owe a business duty to the Debtor to make and maintain such records. The records of the Debtor are made at or near the time of the occurrence of the event or events of which they are a record. I have personally reviewed the records and files as they relate to the matters raised in this Declaration and I make this Declaration based upon that personal review.

3.      Pursuant to the Motion, the Debtor seeks an order, pursuant to Section 363 of Title 11 of the Bankruptcy Code (the "**Bankruptcy Code**"), approving the sale of certain of the Business assets (the "**Acquired Assets**"), free and clear of all liens, claims and interests to Ten Mile Brewing, LLC, or its assignee ("**Buyer**") pursuant to the Asset Purchase Agreement (the "**Agreement**" or "**APA**")[7] entered into between the Buyer and the Debtor. The Buyer owns a business similar to the Debtor's, which is well known both to the Debtor and other interested parties. The Buyer's business is performing well financially, and the Debtor is satisfied that the Buyer has the financial capacity to complete the sale and capital to operate and perform on the obligations on the Acquired Assets, and consummate the transaction. The Debtor has received financial information concerning the Buyers credit worthiness. The sale will be noticed to all previous interested parties to the Acquired Assets, and to creditors and other interested parties.

[7] Unless otherwise stated, defined terms are as set forth in the APA.

The Debtor believes that all burdens of establishing a sound business justification for the sale of the Acquired Assets have been met. The Debtor believes that the purchase price (the "**Consideration**") maximizes the value of the Acquired Assets to the estate. The terms of the sale with the Buyer have been negotiated at arms-length and the consideration for purchase of the Acquired Assets is fair and reasonable, and represents the fair market value for the Acquired Assets. Therefore, the Motion should be approved. If there are over bidders for the purchase of the assets, the Debtor requests that the procedures outlined herein are approved.

4. On or about May 9, 2022, the Debtor commenced this case by filing a Voluntary Petition under Chapter 11, Title 11, United States Code (the "**Petition Date**"). The Debtor is operating its business and managing its financial affairs as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5. The Debtor operated a craft brewery and tasting room (the "**Business**") in the Boyle Heights section of Los Angeles from 2015 through 2022. It was the first craft brewery on the eastside of LA since the 70s. Since opening, the Business has grown and attracted a devoted following of local customers as well as people looking for a comfortable space to unwind near downtown Los Angeles. It had over 200 accounts throughout Los Angeles and was served at Dodger Stadium in 2021. The Debtor encouraged many local food vendors and merchants to do their first "pop up" at the Business and as a result, several small businesses launched from the welcoming atmosphere created by the Debtor.

6. The Debtor has been profitable in the past, and is very well regarded, however, a number of events impacted its ability to continue profitable operations. **First**, due to the COVID Pandemic its Business was severely impacted. In March 2020, all of the City of Los Angeles went dark. The COVID Pandemic, unprecedented in scope and destruction, spawned a massive and severe government response that completely shuttered the Debtors operations and in fact prohibited similar operations in the City of Los Angeles. From March 2020 through June 2020 the Debtor's tasting room (which accounted for 65% of its revenue in 2019) was shut down other than selling beer to go. In June 2020, it appeared that the City of Los Angeles would once again be

opened up for activities such as the brewery operation, unfortunately, the COVID-19 Pandemic shortly took a turn for worse, and on July 1, 2020, the State of California and then the City of Los Angeles, issued temporary closure of indoor restaurant and brewery operations, including the Debtor.   From March 2020 through March 2021 the Debtor's tasting room was only open for a handful of weeks (with strict regulation) and once permitted to open in March 2021, the Debtor was only able to operate outdoors and at 50% of capacity.   Thus, from March 2020 through the February 2022 (the "**Pandemic Period**") the Debtor was either closed or required to operate at only 50% capacity.  Against this backdrop, the Debtor struggled to survive.

7. **Second**, prior to and throughout the COVID Pandemic and presently the Debtor has had a number of disputes with its landlord, 2301 East 7th Street, LLC (the "**Landlord**"). On or about June 30, 2014, Landlord and the Debtor entered into a written lease for the premises located at 2301 East 7th Street, #100C (the "**Lease**") in which the Business operated.  On or about January 8, 2020, the Landlord and the Debtor entered into an amendment to the Lease (the "**First Lease Amendment**"), which increased the term of the Lease for six years, commencing February 19, 2020 and ending February 18, 2025 (the "**Term**").  The First Lease Amendment provided for monthly base rent in the amount of the $13,800 plus a proportionate amount for various property expenses (the "**Rent**").

8. During March 2020, Los Angeles County issued an Executive Order that imposed a temporary moratorium on evictions for non-payment of rent by residential or commercial tenants impacted by the COVID Pandemic (the "**Moratorium**").  The Moratorium has been extended through December 2022. Pursuant to the Moratorium which the Debtor took advantage of, commercial tenants, such as the Debtor with less than 9 employees have until January 31, 2023 to repay any past due rent that accrued from March 2020 to January 2022.  Notwithstanding the Moratorium and the relief from Rent it provided, the Debtor, in good faith, paid Rent to Landlord during the Pandemic Period in an amount equal to approximately $168,000 (or one year's Rent).

9. In September 2020, given the impact of the COVID Pandemic on its operations, and the horrid business conditions that persisted, the Debtor began actively marketing its Business

and related assets in hopes of entering into a sale to allow it to extricate itself from its mounting

liabilities and to satisfy its creditors.

10.     By October 2020, the Debtor entered into negotiations with Alan Newman of

Alchemy & Science in Burlington, Vermont, as a prospective buyer for the Business (the "**First**

**Buyer**").  The First Buyer and Debtor delivered a letter of intent to the Landlord however the sale

to the First Buyer never occurred due to resistance of the Landlord to entertain any modifications

to the Lease despite the realities of the COVID Pandemic and its impact on the Debtor's Business.

From November 2020 through January 2021, the Debtor contacted the Landlord on multiple

occasions to discuss additional potential buyers and sales.  These contacts were either not

responded to, or the Debtor was otherwise instructed that the Landlord refused to consent to any

sale or modifications to the Lease.

11.     In March 2021, the Landlord, in violation of the Moratorium, sued the Debtor and

its members for failure to pay rent during the Pandemic.  The lawsuit resulted in even further

economic duress of the Debtor and its members at a time when it was losing a significant amount

of money and barely operating.

12.     On December 2, 2021, the Debtor, after a for sale process that produced three term

sheets from three different potential buyers, signed a term sheet with a successful and existing

brewery, Los Angeles Ale Works, LLC (the "**Second Buyer**").  The Second Buyer operated a

brewery and tasting room in Hawthorne for six years, was in the process of opening another

location in Culver City which has now opened, and was interested in the Business because it

provided a turn-key opportunity for expansion in the downtown area. The Debtor and the Second

Buyer entered into a term sheet pursuant to which the Second Buyer would acquire the Business

(the "**Sale**").   The proceeds of the Sale would have paid the Landlord in full as well as all the

Debtors creditors (including the Small Business Administration, the IRS and other governmental

entities) while the members and equity holders of the Debtor were not to receive any proceeds.

The Sale was being conducted completely for the benefit of the creditors and the Landlord was

receiving almost 50% of the Sale proceeds.

13.     On December 2, 2021, the Debtor provided a copy of the executed term sheet to the Landlord.  It requested a copy of the Lease cure amount and an assignment.  From approximately December 2 to December 13, 2021, the Debtor continued to inform the Landlord that it was losing cash, and that it needed to know the Landlord's position, as it did not want to lose the Second Buyer.

14.     On December 13, 2021, the Landlord informed the Debtor that it would not consider a Lease assignment or modification until the Lease defaults were cured.  The next day, the Debtor again informed the Landlord that it did not have sufficient cash to cure the default and the only way that it could cure the Lease defaults was through the Sale.  The Debtor explained that it had found an excellent and well-qualified buyer for the Business, any Lease defaults would be cured in full upon closing of the Sale via an escrow payment, and that all the Landlord needed was to consent to an assignment which would cure every default and provide the Landlord with full payment.  Absent this, the Debtor explained that it would have no choice but to seek bankruptcy protection.

15.     On February 28, 2022, due to the devastating effects of the COVID Pandemic, the Debtor ceased operating the Business to the public, except for a very small and limited distribution of beer cans sold through online media.

16.     On March 29, 2022, the Debtor informed the Landlord that the Sale between the Second Buyer and the Debtor was in the final stages of lender approval, and that it expected to close on approximately April 15, 2022, at which point the amount necessary to cure all Lease defaults and pay the Landlord's legal fees would be placed into escrow and the assignment would be sent to the Landlord.

17.     On April 14, 2022, the Debtor provided the Landlord with an executed purchase agreement (the "**APA**") with the Second Buyer for the Sale, along with a draft assignment that provided for: (a) repayment in full of all amounts owing to the Landlord (including all of its legal fees for its lawsuit against the Debtor and its managing members), (b) resolution and release of all outstanding claims, (c) a new tenant for the remainder of the term of the lease, and (d) all existing

personal guarantees to remain in place. The Debtor explained that the Sale was expected to close on April 25, 2022, and that the Second Buyer was an established brewery that operated for several years in Los Angeles, and that the COVID Pandemic had forced the Debtor to close. The Debtor further stated that if the Sale did not close, it would have no choice but to file for bankruptcy. The Landlord then thwarted the Sale by refusing to consent to an assignment that would have provided it with full repayment and a new tenant. On April 28, 2022, the Second Buyer informed the Debtor that it was no longer interested in buying the Business and terminated the APA and the Sale because it could not comprehend why the Landlord would reject an assignment that paid it in full and gave it a new tenant for the remainder of the Lease with no effort, cost or assistance from the Landlord.

18.     The effects of the COVID Pandemic, coupled with the realization that there was nothing else to offer the Landlord to obtain its consent resulted in the Debtor having no alternative but to file this case.  Without the Sale proceeds, the Debtor has no ability to pay its creditors other than a liquidation sale which would result in likely less than the proceeds of the Sale. As a result, the Debtor commenced its Chapter 11 bankruptcy case. The Debtor believes that through liquidation of its assets and its claims against the Landlord, it will be able to make a significant distribution to its creditors on their claims.

19.     As set forth above, the Debtor has been attempting to sell its assets for a number of years. In fact, the Debtor had a number of purchase agreements to purchase all of its assets, however in each instance the sales required the assignment of the lease which was withheld by the Landlord. Consequently, the Debtor does not believe it can sell all of its assets to a purchaser who would operate in its present location. Therefore, the Debtor has marketed individual or groups of its assets to many potential purchasers to obtain the best and highest value for those assets.

20.     The Debtor's principals have been in the brewery business in Los Angeles for a significant period and are very familiar with virtually every player in the field. Consequently, the principals reached out through the industry, and contacted the LA Brewers Guild ("**Brewers Guild**") email list with over 88 local breweries included and has daily emails and threads relevant

to the local guild members) with the attached equipment spreadsheet (which includes the equipment included in the sales agreement).  Have informed the Brewers Guild the Debtor will be having an open house Wednesday May 25th from 10-3pm where breweries can come view the equipment and make a bid (including equipment subject to the agreement). Further the Debtor has received six (16) emails of interest so far with the majority saying they will attend the open house on May 25th to view the Acquired Assets. The principals also generally have made it known throughout the industry that they would be agreeable to a sale, and believe they have reached any and all potential purchasers regarding the sale of the Acquired Assets.

21.    **The Debtor has determined that the best way to maximize value for its creditors and the estate is to sell the Acquired Assets to Buyer.** The Debtor conducted an extensive marketing effort for the Acquired Assets. Therefore, the Seller desires to sell, and Buyer desires to purchase, subject to the terms and conditions hereof and in accordance with Sections 363 and 365 of the Bankruptcy Code, the Acquired Assets as described in the APA.

22.    The proposed Sale of the Acquired Assets pursuant to the procedures on the timeline proposed herein represents the best opportunity to maximize the value of the Debtor's estate for all interested parties. **The Debtor's ability to consummate the proposed Sale as soon as possible is essential to maximizing the value of the estate going forward. The Sale gives creditors of the estate the certainty of payment in a very short time.**

23.    **The full terms of the Sale are set forth in the Agreement attached hereto and incorporated herein by this reference as Exhibit "A".  A summary of the relevant terms are as follows[8]:**
**Terms of the Sale.**

The terms of the Sale can be summarized as follows:

Purchase of Assets.    Upon satisfaction of the Effective Conditions, subject to the terms and conditions of this Agreement, Seller hereby sells, assigns, transfers, conveys and delivers to Buyer (and Buyer hereby purchases), free and clear of any liens and security interests all of

---

[8] The Agreement should be consulted for all terms of the Sale.

Seller's right, title and interest in, to and under all of the equipment listed on Schedule I attached hereto (collectively, the "*Acquired Assets*").

Purchase Price.   In consideration for the sale and transfer of the Acquired Assets, Buyer hereby agrees (a) to pay to Seller, $5,000 in immediately available funds (the "*Purchase Price*").

Liabilities.   Buyer does not assume and shall in no event be liable for any debts, liabilities, obligations or responsibilities of any kind whatsoever of Seller and/or relating to the Acquired Assets, whether direct, indirect, recorded, unrecorded, accrued, absolute, contingent or otherwise, known or unknown, whether due or to become due, all of which shall remain the sole obligations of Seller.

Further Assurances.   Seller shall deliver other bills of sale, endorsements, assignments, releases, and other good and sufficient instruments of transfer, assignment, and conveyance and assumption, in form satisfactory to Buyer and its counsel, as shall be effective to convey to Buyer good and merchantable title in and to the Acquired Assets.

Effectiveness.   This Asset Purchase Agreement shall become effective upon satisfaction of the following conditions precedent:

(a)     entry of an order of the United States Bankruptcy Court for the Central District of California, Los Angeles Division with respect to Seller's bankruptcy case approving the transactions contemplated by this Agreement subject to overbid, including without limitation the sale of the Acquired Assets free and clear of all liens and security interests; and

(b)     payment of the Purchase Price to Buyer.

24.     The date that all conditions precedent have been satisfied and the Acquired Assets are made available to Buyer to possess, shall be referred to as the "*Closing Date*"".

**THE FULL TERMS AND CONDITIONS OF THE SALE ARE INCLUDED IN THE APA ATTACHED HERETO AS EXHIBIT "A**

25.     The proposed Sale of the Acquired Assets pursuant to the procedures on the timeline proposed herein represents the best opportunity to maximize the value of the Debtor's estate for all interested parties.  The Debtor's ability to consummate the proposed Sale as soon as possible is essential to maximizing the value of the estate going forward.

26.     **As mentioned above, all of the Debtor' right, title and interest in all of the Acquired Assets shall be sold free and clear of any liens, security interests, claims, charges or encumbrances in accordance with §363 of the Bankruptcy Code.  The Debtor proposes that any such liens, security interests, claims, charges or encumbrances, shall attach to the**

1    amounts payable to the Debtor resulting from the Sale (the "Sale Proceeds"), and held by

2    the Debtor, in the same order of priority and subject to the rights, claims, defenses, and

3    objections, if any, of all parties with respect thereto, subject to any further order of the

4    Court.[9]

5         27.    The Debtor has and continues to solicit offers and has coordinated the process of

6    informing potential bidders and evaluating those offers received on the Debtor's behalf. In order to

7    maximize the greatest value for this estate and its creditors, **at the time of the hearing on**

8    **approval of the Sale**, parties offering to purchase the Acquired Assets shall have the opportunity

9    to overbid the purchase of the Acquired Assets on substantially the same or better terms as those

10   set forth in the Agreement.

11        28.    The initial overbid will be six thousand dollars ($6,000) cash or other amount set

12   by the Bankruptcy Court (*"Overbid"*), and the other obligations that Buyer has agreed to under

13   the Agreement. In addition: (a) all third party bids must be in form and substance substantially and

14   materially similar to the bid submitted pursuant to the Agreement; (b) any third party making an

15   Overbid (*"**Overbidder**"*) must submit to counsel of the Seller, by no later than six (5) business

16   days before the hearing set to approve the Sale, cash or a money order or a cashier's check made

17   payable to "Kogan Law Firm, APC Client Trust Account" in the amount of six thousand dollars

18   ($6,000), which amount shall be paid by any successful Overbidder as a nonrefundable deposit

19   and held by Seller in a trust account pending closing of the sale transaction; and (c) at the time of

20   the Sale, any Overbidder must demonstrate the ability to pay the remaining portion of the purchase

21   price (*"**Remainder Amount**"*) and to successfully consummate the sale transaction.  Buyer shall

22   have the right to participate in any Overbid proceeding.

23        29.    Furthermore, in order for each Qualified Bidder to present a "Qualifying Bid," the

24   following must occur:

---

26   [9] The Debtor believes it has 2 secured creditors who may assert a lien on the Acquired
     Assets. U.S. Bank has a 1st lien on all of the assets of the Debtor and is owed approximately
27   $59,170, and the Small Business Administration has a 2nd Lien on all assets of the Debtor and is
     owed approximately $150,000. The Debtor has conducted a recent UCC search setting forth all
28   liens against the Debtor. No other liens were found that assert an interest in the Acquired Assets.

(i) The Qualifying Bidder must submit an asset purchase agreement along with its deposit ("**Modified Asset Purchase Agreement**") which must contain a purchase price in an amount at least equal to the sum of the Purchase Price in the Buyer Agreement and equal to $6,000;

(ii) The Modified Asset Purchase Agreement must state that the bidder offers to purchase all or some of the Assets upon the terms and conditions as set forth in the Buyer Agreement or through an alternative structure on terms and conditions no less favorable to the Debtors than the terms and conditions contained in the Buyer Agreement (as determined by the Debtor in their reasonable business judgment);

(iii) The Modified Asset Purchase Agreement must state that the bidder is financially capable of consummating the transactions contemplated by the Modified Asset Purchase Agreement;

(iv) The Modified Asset Purchase Agreement must state that the Qualified Bidder's offer is irrevocable until the Closing if such bidder is the Prevailing Bidder or if such bidder is the Back-Up Bidder (as defined below) until such time as outlined below;

(v) The Modified Asset Purchase Agreement must fully disclose the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(vi) The Modified Asset Purchase Agreement must state that such bid does not contain any due diligence or financing contingencies of any kind other than contained in the Agreement and approval of the Sale by the Bankruptcy Court; and

(vii) The Modified Asset Purchase Agreement must include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Asset Purchase Agreement.

30.     **The Debtor shall have the exclusive right to determine whether a bid is a Qualifying Bid and shall notify bidders whether their bids have been recognized as such prior to the Auction.**[10]

---

[10] All rights granted in favor of Debtor in these Bidding Procedures shall be exercised in

**In the event that the Debtor timely receives more than one Qualifying Bid, the Court shall conduct the Auction with respect to the Assets at the hearing on the Motion.**

31.    The Sale of the Assets shall be on an "as is, where is" basis, without representations or warranties of any kind, nature or description by the Debtor or Debtor's estate, except as may be specifically set forth in the Agreement.

32.    The Prevailing Bid will be subject to approval by the Court at the hearing on the Motion.

33.    The transactions contemplated hereby shall be consummated (the "**Closing**") on the third business day after the Sale Order becomes a final order (the "**Closing Date**") at a time and place mutually agreed upon by Buyer and Seller. Notwithstanding anything to the contrary, Buyer may waive the "finality" with respect to the Sale Order and may specify a Closing date for any business day after entry of the Sale Order. If Closing does not occur as scheduled, Buyer and Seller may mutually extend the Closing Date from time to time. Any cancellation or non-extension of this Agreement by either party shall not prejudice any claims the canceling party may have for breach or non-performance of this Agreement.

34.    If an Auction is conducted, the party with the next highest or otherwise best Qualifying Bid at the Auction, as determined by the Debtors in the exercise of its business judgment, shall be required to serve as a back-up bidder (the "**Back-Up Bidder**").

35.    Following the Sale Approval Hearing, if the Prevailing Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Prevailing Bidder, or provide the Final Qualification Packages, the Back-Up Bidder's bid will be deemed to be the new Prevailing Bid, and the Debtor will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Court upon at least 24 hours' notice to the Notice Parties (defined below). In such case, the Prevailing Bidder's Deposit and, if applicable, its Additional Deposit, shall be dealt with in accordance with the terms of its Modified Asset Purchase Agreement, and the Debtors specifically reserve the right to seek all available damages

accordance with its fiduciary obligations.

1  from the defaulting Prevailing Bidder in accordance with the terms of that party's Asset Purchase

2  Agreement.

3      36.    In the event that the Debtor fails to consummate a transaction with the Back-Up

4  Bidder, the Back-Up Bidder's Deposit shall be dealt with in accordance with the terms of its Asset

5  Purchase Agreement and the Debtor specifically reserve the right to seek all available damages

6  from the defaulting Back-Up Bidder in accordance with the terms of its Asset Purchase

7  Agreement.

8      37.    The facts of the instant case justify and substantiate the Debtor's business decision

9  that the contemplated sale of the Acquired Assets is in the best interest of the estate and should be

10  approved by this Court.  The sales price was derived through arms-length negotiations and

11  represents the fair market value for the Acquired Assets.  Furthermore, in light of the current

12  economic conditions, the Debtor believes that the offer is the best offer it will receive.  By selling

13  the Acquired Assets, the Debtor will best be able to reorganize its business.

14      38.    The Debtor believes that the offer is the highest and best offer it will receive,

15  particularly in light of the problems facing its business.  The terms of sale are greater than the

16  value the Buyer contends they are worth.  The Buyer, however, is willing to pay this price because

17  of the unique opportunity to purchase the Acquired Assets.  Thus, the Consideration is "fair and

18  reasonable".

19      39.    In the instant case, the Buyer is not an insider within the meaning of

20  Section 101(31), and the sale has been negotiated at arms-length.  As set out in detail above, the

21  Consideration is fair and reasonable.  The Debtor believes that the Buyer's offer is the best offer

22  he will receive.  For these reasons, the sale meets the good faith requirement.

23

24

25

26

27      I declare under penalty of perjury pursuant to the laws of the United States of

28  America that the foregoing is true and correct.

Executed on June 23, 2022 at Los Angeles, California.

Kevin O'Malley

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "*Agreement*") is entered into as of June 22, 2022 (the "*Execution Date*") by and among **INDIE BREWING LLC**, a California limited liability company ("*Seller*"), and **TEN MILE BREWING, LLC**, a California limited liability company ("*Buyer*").

1.   Purchase of Assets.   Upon satisfaction of the Effective Conditions, subject to the terms and conditions of this Agreement, Seller hereby sells, assigns, transfers, conveys and delivers to Buyer (and Buyer hereby purchases), free and clear of any liens and security interests all of Seller's right, title and interest in, to and under all of the equipment listed on Schedule I attached hereto (collectively, the "*Acquired Assets*").

2.   Purchase Price.   In consideration for the sale and transfer of the Acquired Assets, Buyer hereby agrees to pay to Seller, $5,000.00 in immediately available funds (the "*Purchase Price*") plus all shipping and related costs and expenses.

3.   Liabilities.   Buyer does not assume and shall in no event be liable for any debts, liabilities, obligations or responsibilities of any kind whatsoever of Seller and/or relating to the Acquired Assets, whether direct, indirect, recorded, unrecorded, accrued, absolute, contingent or otherwise, known or unknown, whether due or to become due, all of which shall remain the sole obligations of Seller.

4.   Further Assurances.   Seller shall deliver other bills of sale, endorsements, assignments, releases, and other good and sufficient instruments of transfer, assignment, and conveyance and assumption, in form satisfactory to Buyer and its counsel, as shall be effective to convey to Buyer good and merchantable title in and to the Acquired Assets.

5.   Effectiveness.   This Asset Purchase Agreement shall become effective upon satisfaction of the following conditions precedent:

(a)   entry of an order of the United States Bankruptcy Court for the Central District of California, Los Angeles Division with respect to Seller's bankruptcy case approving the transactions contemplated by this Agreement subject to overbid, including without limitation the sale of the Acquired Assets free and clear of all liens and security interests; and

(b)   payment of the Purchase Price to Seller in immediately available funds.

The date that all conditions precedent have been satisfied and the Acquired Assets are made available to Buyer shall be referred to as the "*Closing Date*".

IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT, EXCEPT AS MAY BE OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, BUYER ACCEPTS THE CONDITION OF THE PURCHASED ASSETS "AS IS," "WHERE IS" AND "WITH ALL FAULTS" WITHOUT ANY IMPLIED REPRESENTATION, WARRANTY OR GUARANTEE AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE, OR AS TO THE CONDITION OF THE PURCHASED ASSETS, OR AS TO THE CONDITION, SIZE, EXTENT, QUANTITY, TYPE OR VALUE OF SUCH ASSETS, AND SELLER HEREBY EXPRESSLY DISCLAIMS ANY AND ALL SUCH IMPLIED REPRESENTATIONS, WARRANTIES OR GUARANTEES.

THIS AGREEMENT, INCLUDING THE VALIDITY HEREOF AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY IN SUCH STATE (WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PROVISIONS THEREOF).

[signatures to appear on following page]

WITNESS the due execution and delivery hereof on the date first above written.

**SELLER**:

INDIE BREWING LLC

By: _____

Name:   Kevin O'Malley

Title:    Manager

**BUYER**:

**TEN MILE BREWING, LLC**

By: _____

Name: Jesse Sundstrom

Title: Co-Owner/Head Brewer

*(SIGNATURE PAGE TO SALE AGREEMENT – TEN MILE)*

**SCHEDULE I**

**ACQUIRED ASSETS**

| Asset | Purchase Price |
|---|---|
| Velo Leaf Filter | $5,000 |

| In re: Indie Brewing, LLC | | CHAPTER: 11 |
|---|---|---|
| | Debtor(s). | CASE NUMBER: 2:22-bk-12633-ER |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 18500 W. Olympic Blvd., Suite 400, Los Angeles, CA 90064

A true and correct copy of the foregoing document described as **MOTION OF DEBTOR FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS OF THE DEBTORS BUSINESS ASSETS – TEN MILE BREWING, LLC** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 27, 2022**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On **June 27, 2022** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed. *VIA U.S. MAIL*

☒ Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| June 27, 2022 | Pamela Lynn | /s/Pamela Lynn |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

| In re: Indie Brewing, LLC | CHAPTER: 11 |
|---|---|
| Debtor(s). | CASE NUMBER: 2:22-bk-12633-ER |

**ADDITIONAL SERVICE INFORMATION (if needed):**

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

Michael S Kogan on behalf of Debtor
mkogan@koganlawfirm.com

United States Trustee (LA)
ustpregion16.la.ecf@usdoj.gov

Hatty K Yip on behalf of U.S. Trustee United States Trustee (LA)
hatty.yip@usdoj.gov, hatty.k.yip@usdoj.gov

Peter F Jazayeri on behalf of special counsel Indie Brewing, LLC
peter@jaz-law.com

Michael W Vivoli on behalf of Plaintiff 2301 East 7th Street, LLC
mvivoli@vivolilaw.com, sbrown@vivolilaw.com

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL** - VIA U.S. MAIL

Presiding Judge
Honorable Ernest Robles
U.S. Bankruptcy Court
255 E. Temple St., #1560
Los Angeles, CA 90012